ELLA H. MINER *vs.* CONNECTICUT RIVER RAILROAD COMPANY.

Hampden.    September 23, 1890. — March 2, 1891.

Present: FIELD, C. J., W. ALLEN, C. ALLEN, HOLMES, KNOWLTON, MORTON, & LATHROP, JJ.

*Injury to Property — Assumption of Risk — Evidence of Value — Remoteness.*

In an action against a railroad company to recover the value of the plaintiff's horse, there was evidence that an employee of the plaintiff's husband went as directed to the defendant's freight yard, where it delivered freight to consignees, for a load of grain; that before entering the yard he saw that the car containing the grain was in a dangerous place and appreciated the risk of going to it with the horse; that, without having the car removed to another place as he might have done, he took the horse by the head and led it in; and that while there the accident happened by which the horse was killed. *Held,* that the defendant was entitled to an instruction to the jury, that, if the employee knew the situation and the danger and voluntarily assumed the risk, then the plaintiff could not recover.

On the question of damages for the killing of a horse six years old, it is within the discretion of the presiding judge to exclude, as too remote, proof of what the horse cost at private sale two years before.

TORT, for the killing of the plaintiff's horse, and for injuries to her wagon and harness.

At the trial in the Superior Court, before *Dewey,* J., there was evidence that the defendant's freight yard in Springfield extended from its freight station to an embankment wall which enclosed a highway passing under the tracks, and supported a railroad bridge; that the top of this wall was at the same grade as the yard, and was unguarded by any railing; that the freight cars in the yard were being constantly distributed about the various tracks and made up into trains; that the defendant used this freight yard among other things as a place for delivering freight to its customers; that, upon the arrival of freight, the consignee was notified by the defendant's agent to pay the charges within a limited time and to take the freight away, being given the number of the car and its position in the yard for that purpose; that the consignee would thereupon unload the freight from the car and take it away; that one Gourley, who was in the employ of the plaintiff's husband, went to Springfield with the plaintiff's horse and wagon for a load of grain; that he went to a store in Springfield, and was there directed to go to the freight yard for the load, and was told the number of the car containing the grain; that he found the car in the freight yard standing close to the wall and the bridge, and went to it with the horse and wagon; and that the horse being frightened by the bumping of freight cars upon an adjoining track, backed over the wall and was killed, and the harness and wagon were injured.

Gourley testified, among other things, as follows: " When I got there, I took the horse by the head for fear of danger. I saw I was in a confined place. I went to back up, cars came down the track, and one jumped against the other like that [showing]; the beast gave a jump and lifted me off my feet. Then the cars bumped together two or three times more, and seeing nothing to save me — no railing — I was forced to go down; I could n't help it. The horse backed over the wall and took me with it. There was no railing on the wall. The cars that bumped together were freight cars on the track just the other side of the track where the car was that I was going to load from. I think they broke out some piece of the train and drove out five or six, and these bumped together. This happened two or three times. Up to the time the cars bumped together, there was no trouble." On

cross-examination, he testified that he was not sent by the plaintiff's husband, Mr. Miner, to the railroad, but to a store. " When I got to the railroad, and before I brought the team from the street, I saw that the car was close to the wall, and close to or partly on the bridge. I saw just how the land lay. I saw that it was close to the wall and offset, and that it was a dangerous place. I led the horse from where it was in the street up towards the car. The reason I did not get in and drive up was because I was afraid of where I was going to back up. I thought I would be safer to have the horse by the head. I saw if I should lose control of the horse, it would be dangerous. I could see all the tracks at the place, and knew it was a freight yard; any man would know that. There were plenty of cars standing round, and men at work running cars up and down. I could see the cars coming down; I knew that when freight cars are started or backed, they will bump. You can't handle a freight train very well without getting some bumping. I did not ask to have the car moved. I saw the car there. I wanted to get my load on. I knew it was a dangerous place. I thought I might be all right, and I dare say I would if the bump had not happened; it came very sudden. It was the first time I had ever had the horse where there was any bumping of the kind."

One Mesick testified that he was a grain dealer, and was accustomed to have grain come over the defendant's railroad; and that " the agent of the company gives us the number of the car, and we go and look it up, and wherever we find it, we take our goods out, and this is the way we have been doing for years." On cross-examination, he said : " They give us the number of the car, and we look it up. If we find it is not in a suitable place to unload, we tell them, and they put it in a suitable place. If we are satisfied with the place, we unload it, and if we are not satisfied, we tell them, and they put it where we can unload it "; that he had had frequent occasion to go there himself; and that it was a very busy place, cars bumping together, and all noises incident to the business.

The husband of the plaintiff, in testifying to the value of the horse, upon cross-examination, stated that he bought the horse for his wife about two years previous to the accident, and paid for it in cash; and that the horse at the time of the accident

was six years old. The judge refused to permit the defendant to ask him what was paid for the horse when so purchased; and the defendant excepted.

The defendant asked the judge to rule and instruct the jury as follows: "1. Upon all the evidence in the case, the plaintiff cannot recover. 2. If the defendant conducted its business in its freight yard in the usual and ordinary method of railroads doing such business, and made no more or different noise in the handling of its trains than is usual, the plaintiff cannot recover for any injury occasioned thereby. 3. If the jury find that the plaintiff, or the person in charge of the horse, saw the condition of the freight yard and wall adjoining, and knew the danger, and voluntarily assumed the risk, the plaintiff cannot recover. 4. If the jury find that the plaintiff, or the person in charge of the horse, knew or would by the use of due care have known of the condition of the premises, and the use that was made of the same, and the dangers incident thereto, and voluntarily assumed the risk, the plaintiff cannot recover."

The judge refused so to rule and instruct, but submitted the case to the jury upon instructions which dealt only with the question of negligence on the part of the defendant, and of due care or contributory negligence on the part of the plaintiff, and which permitted her to recover if the defendant set apart the freight yard for the use of its customers in getting their freight, and had negligently failed to have it in a reasonably safe condition, or to conduct its business there in a reasonable manner, and if Gourley went into the yard by the express or implied invitation of the defendant for the purpose of transacting business between his employer and the defendant, and was at the time of the accident in the exercise of reasonable and ordinary care.

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

The case was argued at the bar in September, 1890, and afterwards was submitted on the briefs to all the judges.

*G. Wells & J. Barnes,* (*W. W. McClench* with them,) for the defendant.

*G. D. Robinson,* (*W. Robinson* with him,) for the plaintiff.

C. ALLEN, J. Under the instructions which were given to the jury, they must have found that Gourley was rightfully in the

defendant's freight yard, upon the implied invitation of the defendant; that the defendant was negligent in failing to provide a suitable place for the delivery of freight, or in failing to manage its business there properly; and that Gourley was in the exercise of reasonable care in going there, and in what he did while there.    These questions were properly submitted to the jury.

The principal point raised by the bill of exceptions is, whether the defendant was entitled to have an instruction given to the jury, in substance, that, if Gourley knew the situation and the danger, and voluntarily assumed the risk, then the plaintiff could not recover.

There can be no doubt that there are cases where the principle which is often expressed by the maxim, *Volenti non fit injuria*, will have the effect to debar one from a remedy which might otherwise be open to him.

This principle was recently applied by this court in a case where the plaintiff, who was employed in a mill, volunteered to make certain repairs of machinery which it was no part of his regular duty to make, understanding perfectly what the defect was, and what might happen from it, and was hurt.    It was held that he took the risk.    *Mellor* v. *Merchants' Manuf. Co.* 150 Mass. 362.

In the present case there was no relation of master and servant existing between the defendant and Gourley.    Gourley was employed by the plaintiff's husband to take the plaintiff's team and go to Springfield for a load of grain, and was directed by the vendor to go to the defendant's freight yard, and was told the number of the car containing the grain.    While he was in the freight yard, the accident happened by which the plaintiff's horse was killed.    There was evidence tending to show that Gourley knew and appreciated the danger, before entering the freight yard, and took the horse by the head and led it in. The testimony of Mesick, on cross-examination, tended to show that Gourley might have had the car moved to another place before being unloaded.

Independently of any relation of master and servant, there may be a voluntary assumption of the risk of a known danger, which will debar one from recovering compensation in case of injury to person or property therefrom, even though he was in

the exercise of due care.  In other words, it may be consistent with due care to incur a known danger voluntarily and deliberately; and this may be so when the danger arises from the known or apprehended neglect or carelessness of others.

Ordinarily, in actions to recover damages for injuries to person or property, an instruction as to the effect of contributory negligence on the part of the plaintiff will cover all that need be said to the jury upon this branch of the case.  But the principle that one may be debarred from a recovery when he voluntarily assumes the risk is not identical with the principle on which the doctrine of contributory negligence rests, and in proper cases this ought to be explained to the jury.  One may with his eyes open undertake to do a thing which he knows is attended with more or less peril; and he may, both in entering upon the undertaking and in carrying it out, use all the care he is capable of.  But whether or not he thereby assumes the risk may depend on other circumstances.  One may without fault of his own be in a situation where he must choose a perilous alternative.  The degree of danger, the stress of circumstances, the expectation or hope that others will fully perform the duties resting on them, may all have to be considered.

There has been some discussion in recent English cases upon the question, under what circumstances, or in what state of mind, one must be in order to make it proper to find that he voluntarily assumed a risk, or that he was *volens*, within the meaning of the maxim.  *Membery* v. *Great Western Railway*, 14 App. Cas. 179, 186.  *Thrussell* v. *Handyside*, 20 Q. B. D. 359.  *Yarmouth* v. *France*, 19 Q. B. D. 647.  We have no occasion to enter nicely into that question here, or to undertake to define the limits of the application of the doctrine, because it was not dealt with at the trial.  The defendant asked for a ruling that the plaintiff could not recover if Gourley knew of the danger and voluntarily assumed the risk.  The court wholly omitted to deal with this aspect of the case, except by giving instructions in reference to contributory negligence.

We have not to consider whether, upon the evidence, the defendant was entitled to prevail on this ground, but only whether it was entitled to go to the jury upon it.  In the opinion of a majority of the court, there was sufficient evidence for this pur-

pose, and if the jury should find, independently of any question of contributory negligence, that Gourley with full knowledge voluntarily assumed the risk, or intentionally took it upon himself, their verdict should be for the defendant.    *Mellor* v. *Merchants' Manuf. Co.*, and other cases above cited.    *Wood* v. *Locke*, 147 Mass. 604.    *Lewis* v. *New York & New England Railroad*, 153 Mass. 73.    *Harwood* v. *Oakham*, 152 Mass. 421.    *Boyle* v. *New York & New England Railroad*, 151 Mass. 102.    *Osborne* v. *London & North Western Railway*, 21 Q. B. D. 220.    *Thomas* v. *Quartermaine*, 18 Q. B. D. 685, 697–699, 702.    *Lax* v. *Darlington*, 5 Ex. D. 28.    *Clayards* v. *Dethick*, 12 Q. B. 439.

A question of evidence remains.    With a view to reduce the damages, the defendant sought to show what the horse had cost two years before the accident, it being six years old at the time of the accident; but the evidence was excluded.    Without considering the question whether the price paid for a horse at private sale is competent evidence of its value at or about the time of the purchase, it was clearly within the discretion of the court, in the present case, to exclude the evidence as too remote.

*Exceptions sustained.*