FRANK WILKINS, ADMINISTRATOR, APPELLEE, v. WATER & LIGHT COMPANY OF NEBRASKA CITY ET AL., APPELLANTS.

FILED NOVEMBER 27, 1912.   No. 16,852.

1. **Master and Servant:** ERECTION OF TELEPHONE POLES: NEGLIGENCE. The poles and wires of an electric light company were placed in an alley some years previous to the erection of a telephone distributing pole about 2½ feet away on adjacent private property. The telephone wires were contained in an underground conduit in the form of a cable, and the cable was carried up the side of the telephone pole in a metal tube to the bottom of the cable box, which was nearly 30 feet from the ground. There was a platform on the pole 27 feet from the ground. The top of the pole was over 38 feet from the ground. The electric light poles were about 15 feet shorter than the telephone pole. The top cross-arm of the light pole carried two insulated and two uninsulated wires. The other cross-arms carried insulated wires. The bare wires were used as guard wires, and were not intended to carry electricity. The top of the cable box from which the telephone wires emerged for distribution was nearly 10 feet above the top of the light poles, and there was no opportunity for any of the wires of the telephone company to come in contact with the wires of the light company. *Held*, That these facts do not establish negligence on the part of the telephone company in placing its distributing pole in the position where it stood.

2. ———: NEGLIGENCE: ASSUMPTION OF RISK. The doctrine of assumption of risk arises from the relation of master and servant, and does not constitute a defense where that relation does not exist between the parties.

3. **Negligence:** CONTRIBUTORY NEGLIGENCE: QUESTION FOR JURY. The question whether an employee of a telephone company is guilty of contributory negligence in ascending a telephone pole in proximity to an uninsulated wire belonging to an electric light company is a question of fact for the jury, where reasonable minds may differ as to whether ordinary prudence justified the act.

36

4. **Electricity**: NEGLIGENCE. Where the manager of an electric light company is informed that an uninsulated guard wire, which is strung upon poles belonging to that company in close proximity to a telephone distributing pole upon which workmen may reasonably be expected to go, has become charged with a heavy current of electricity from contact with other wires of that company carrying a heavy voltage, it is his duty to remedy the dangerous situation as soon as practicable, and a delay of over 36 hours in remedying the defect may constitute gross negligence on the part of the light company.

APPEAL from the district court for Otoe county: HARVEY D. TRAVIS, JUDGE. *Affirmed as to the Water & Light Company, and reversed as to the Nebraska Telephone Company.*

*Greene & Breckenridge, Paul Jessen, Pitzer & Hayward* and *Edwin Zimmerer,* for appellants.

*Matthew Gering* and *John C. Watson, contra.*

LETTON, J.

Action to recover for the death of plaintiff's intestate, Clinton Gilman. In the opinion, for convenience, the defendant Nebraska Telephone Company will be termed the Telephone Company, and the defendant Water & Light Company of Nebraska City the Light Company.

In the brief of the Telephone Company we find the following statement of facts: "The Water & Light Company of Nebraska City has a line of poles, in a certain alley in that city, along and upon which are strung two electric wires carrying a voltage of from 2,000 to 2,200 volts of electricity. These two wires are strung on the top cross-arm between two guard wires. There was also strung on these poles of the Water & Light Company a bare, uninsulated iron wire which had at one time been used as a signal wire in connection with a stand-pipe valve, and had been used on Sundays up to about March, 1908, for the transmission of a low voltage of electricity, and after that it served the Water & Light Company as a guard wire

to break the drops of individual telephone wires that were higher than the electric light wires. But this bare iron wire became 'crossed' or in contact with one of the high-tension wires, and thereby was unintentionally charged with some of the 2,000 or more volts of electricity which was by intention carried over the two high-tension wires supplying power and light to the customers of the Water & Light Company. The poles of the Water & Light Company have been located in this alley for a long time, and in October, 1909, had become somewhat sagged and out of plumb. As a matter of fact, one of the poles in the alley already mentioned, which for convenient and distinct designation will be spoken of as electric light poles, back of a certain restaurant known as Kastner's, leaned toward a pole of the Nebraska Telephone Company which was outside of the alley and on private property, so that the bare iron wire on the electric light pole already mentioned swung and rubbed against the telephone pole, and had apparently been in contact with the telephone pole at some time when through contact with the live electric wires it was carrying a high current of electricty, for the point of contact was plainly visible on the telephone pole. This iron wire was at a considerable distance above the ground. The telephone pole was about 30 feet high, and was used for the purpose of distributing the telephone wires to the customers of the Telephone Company in that locality. The telephone wires (which ran in an underground conduit) were carried up the side of the pole in a conduit or tube as far as the cable box. * * * The box projected over the property in which the pole was set, and not into the alley; and wires were distributed out of the cable box from the insulators at the cross-arm at the top of the pole to the places of business of the Telephone Company's patrons. The bare iron wire referred to was about 20 feet above the ground. It was not possible for any of appellant's telephone wires to come in contact with any wire of the Water & Light Company. * * * Clinton Gilman, the deceased, was an employee of the Telephone

Company. He had formerly worked for the Water & Light Company, and had had some experience in working around telephone and electric light poles, and wires of both kinds. On October 4, 1909, and while working for the Telephone Company painting telephone poles, he got a shock by contact with this iron wire on the particular pole described in the testimony in the rear of Kastner's restaurant, which was the identical pole from which he fell the following Wednesday, receiving at that time the injuries which terminated his life. This wire had been cut at both ends. It was not used for the transmission of electricity at that time, and the fact that it was allowed to remain there in the situation in which Gilman found it on the afternoon of the day he received his injury created a condition which, it is claimed, was negligent as against the Water & Light Company. When this wire was charged with the electric current, it was through contact with the electric light wire of the Water & Light Company, and not through any crossing or contact of the high-tension wires of the Water & Light Company with any of the Nebraska Telephone Company's wires, none of which were involved in the accident or the cause of it."

Plaintiff concedes that this statement of facts is correct as far as it goes. The following additional facts seem to be established by the evidence. On the afternoon of Monday, October 4, 1909, and while working for the Telephone Company painting the ironwork on this pole, Gilman received a slight shock and was burned on the hand by touching this bare wire. He had been told that the wire was "hot" by another workman who had touched it that day when painting. This wire had become charged through coming in contact with another wire of the Light Company at a distance of a little more than a block away. Gilman, who was apparently much alarmed by the first shock, immediately reported the facts to George Bauman, the foreman of the Telephone Company, who directed him to cease working upon the pole. The foreman testifies that he immediately went to see Mr. Egan, the manager

of the Light Company, and Egan promised to have the matter attended to at once or early the next morning. Egan says he promised to attend to the matter the next Sunday when there was no current on the wires. The next morning Gilman was told by the foreman of the Telephone Company of Egan's promise to make immediate repairs. The repairs were not made, and on Tuesday afternoon, October 5, Bauman told Gilman that he had been informed by employees of the Light Company that the cross had not been cleared. Nothing further was said to Gilman about this matter. On Wednesday forenoon Gilman was engaged in trimming trees. Bauman directed him in the afternoon to resume the work of painting. Bauman testifies: "Q. What did you say to him? A. I told him to go out and follow the work he had been doing. Q. Did you tell him to go to any particular place? A. No, sir. Q. What else did you say to him? A. The last words I said to him was: 'Clint, for Christ's sake be careful.'" Gilman and John Bauman left the shop together. Nothing was said by Gilman to indicate he was going back to work on this pole. Soon afterwards Gilman climbed the pole, and some few minutes after fell to the ground enveloped in flames. He died as a result of the accident.

In substance, the petition alleges that Gilman was employed by the Telephone Company as a lineman; that he was inexperienced and had no knowledge of the effect that contact between wires heavily charged with electricity or between such wires and metal would have; that it was his employer's duty to warn him as to the dangers incident to such work, to furnish him with a reasonably safe place to work, to place its poles at a reasonably safe distance from the wires of the Light Company whose poles and wires were in close proximity; that it was the duty of each of the defendants to keep their poles and wires so that the same would not cross, interfere, or come in contact, to keep them properly insulated and stretched so as not to permit them to sag and become loose; that the

Light Company permitted its wires to become loose so that they crossed and came in contact with the wires, poles and cable of the Telephone Company. It ascribes similar negligence to the other defendant. It further alleges that on October 4, 1909, Gilman reported to each of the defendants that the wires were crossed, and each of them promised to repair the same immediately, but negligently omitted to do so, and that Gilman, relying on the promise, on the 6th day of October, without any knowledge that the wire had not been repaired, attempted to work on a pole of the Telephone Company; that the wires were crossed which caused the accident, and that as a result Gilman died, leaving a widow and one minor child, aged five years, who were dependent upon him for support.

The answer of each defendant pleads that the risks of the service were obvious, and were understood, known to, and assumed by plaintiff, and also pleads contributory negligence on his part.

We will first consider the errors assigned by the Telephone Company. The principal complaint made by this defendant is that the court erred in overruling its motion for a directed verdict, for the following reasons: "(a) The testimony fails to show, and does not tend to prove, any negligence upon the part of the Nebraska Telephone Company which was the proximate cause of the injury resulting in the death of Clinton Gilman; (b) the evidence does not tend to establish why and how the injury to Clinton Gilman was received; (c) it is established that Clinton Gilman knew and appreciated the danger of his situation created by the proximity of the bare wire which was near to or abutting against the telephone pole described in the testimony, and that he assumed the risk of injury therefrom; * * * (e) the ground, as alleged in the petition and stated by plaintiff's counsel in his opening statement to the jury, that defendant's foreman promised and assured Gilman that the dangerous situation of which Gilman was informed, and which he re-

ported to the foreman, would be removed, is not sustained by the proof, nor does it appear in the evidence that he resumed his work relying on any promise of repair made by the Nebraska Telephone Company's foreman; but, to the contrary, he knew that the Telephone Company would not make such repair, and he knew, or had reason to believe, and feared that the danger still existed and that the wire was hot."

We cannot agree that the testimony does not show why and how the injury to Gilman was received. The circumstantial evidence upon this point is sufficient. But we are of the opinion that some of the other grounds upon which the motion was predicated are well taken. We think the evidence fails to show negligence on the part of the Telephone Company in placing its distributing pole where it did. The top of the pole was 38 feet 6 inches from the ground. The bottom of the platform thereon is 27 feet from the ground, and the point on the pole opposite the loose wire is 23 feet 4 inches from the ground. The top of the cable box from which the wires emerged for distribution was nearly 10 feet above the burned place on the pole, and hence there was no opportunity for any of the wires of the Telephone Company to come in contact with the wires of the Light Company, and, in fact, such a condition did not occur. There were two cross-arms on the Light Company's pole beneath the one which carried the dangerous wire, each carrying insulated wires charged with heavy currents. There is no proof that these wires were not properly insulated opposite the pole.

Gilman knew the danger of the situation created by the charged wire which had burned him. The promise which was made to remove the danger was not made to Gilman by his employer, the Telephone Company, but it was a promise made by the manager of the Light Company to the Telephone Company and communicated to him, and there is no proof that Gilman expected or anticipated that the removal of the cross would be made by the Telephone Company, or that he resumed work upon a promise made

by his foreman that the Telephone Company would remove the danger.

We are convinced that it was not negligence on the part of the Telephone Company to place the pole where it did for the purpose of distributing its wires, nor was this the proximate cause of the injury. Neither is it liable for a failure to warn Gilman of the danger, since he had been told by another employee and warned by the foreman of the danger of working on this pole on account of the proximity of the charged wire. There being no negligence on the part of this defendant, the motion should have been sustained. The other errors assigned by the Telephone Company we need not consider.

Taking up the points presented in the brief of the Light Company, several matters with respect to the admission of evidence are urged as being erroneous. The first is that the plaintiff was permitted to show that, after the accident, a piece of rubber hose had been placed over the bare wire at the place of the accident, and it is argued that to admit proof of subsequent repairs made by the employer is prejudicially erroneous. Unfortunately for this contention, no such evidence is in the record. It does appear (at one place without objection) that a piece of rubber hose had been nailed, after the accident, by the foreman of the Telephone Company upon the pole at a point opposite the bare wire. Since no change was made by the Light Company, this could not be prejudicial as against this defendant. Moreover, the jury were carefully instructed as to how far this evidence should be considered. As to the admission of evidence as to Gilman being usually a careful man, we think this could not affect the verdict, since all the facts as to his actions were before the jury.

It is next argued that the proof fails to show that the Light Company failed to perform any duty it owed to deceased, and that hence negligence on its part has not been proved. It is true that the duties of the Telephone Company and the Light Company to Gilman are not the

same. It is also true that, if there had been no telephone pole in that locality, the accident would not have happened, still the Telephone Company had the right to place its pole as it did. If the Light Company had not allowed its poles to lean, and its wire to sag, and negligently allowed a dangerous current to flow through the bare wire, the accident would not have happened. The Light Company knew of the proximity of this pole, with steps on each side, and with a platform and distributing box above the cross-arms and wires of the Light Company, and knew that men might be expected to work there with such tools and appliances as were needed. It owed the duty of exercising care either to insulate its wires at that point, or to see that vagrant and dangerous currents were not allowed to pass through its unused wires. *Olson v. Nebraska Telephone Co.,* 85 Neb. 331; *Atlanta Street R. Co. v. Owings,* 97 Ga. 663, 33 L. R. A. 798. Its manager recognized this duty by his promise to make repairs. The failure to do this was one of the proximate causes of the accident.

This defendant also pleads that Gilman assumed the risks of his employment, and hence that there is no liability on its part. The Light Company owed Gilman, as well as all other persons rightfully using the poles of the Telephone Company, the duty of using no negligence with respect to the upkeep of its wires and poles. The legal doctrine of the assumption of risk arises from the relation of master and servant. Since Gilman was not an employee of the Light Company, he assumed no risks as to the negligence of that company. Moreover, its promise to make immediate repairs had been communicated to him. This defense, therefore, is not available to the Light Company. The Light Company argues that there is no evidence that the wire was heavily charged, and that it may have carried no more than 110 volts. We cannot see that the intensity of the current is of much materiality in this connection. It is apparent that the uninsulated wire was charged with a current which might be dangerous to

workmen on the poles of the Telephone Company. The circumstantial evidence seems to show that Gilman's fall was caused by the metal of the paint pail forming a short circuit with the charged wire and the metal covering of the telephone cable on the side of the pole, thus causing the sudden flashing into fire and exploding of the paint, which was shown to be mineral paint containing turpentine and other highly inflammable ingredients.

The question whether Gilman was guilty of contributory negligence was submitted to the jury under carefully prepared instructions. They were also permitted a view of the scene of the accident. Whether Gilman was justified in attempting to climb the pole and pass the charged wire in order to reach the platform is a question as to which reasonable minds might differ. The question is a close one, but it is peculiarly one for the jury to determine. *Lincoln Rapid Transit Co. v. Nichols*, 37 Neb. 332; *Cudahy Packing Co. v. Wesolowski*, 75 Neb. 787; *Grimm v. Omaha Electric L. & P. Co.*, 79 Neb. 387. We think there is sufficient evidence to warrant a finding for the plaintiff on this point.

The case seems to have been carefully tried and all rights of the Light Company preserved. It was submitted to the jury upon a clear and lucid statement of the law in the instructions. The only prejudicial error we find is that the motion of the Telephone Company for a directed verdict should have been sustained.

The judgment is affirmed as to the Light Company, and is reversed as to the Telephone Company.

JUDGMENT ACCORDINGLY.