PETER LAVELLE'S ADMINISTRATOR *v.* CENTRAL VERMONT
RAILWAY COMPANY.

May Term, 1919.

Present: WATSON, C. J., POWERS, TAYLOR, MILES, and SLACK, JJ.

Opinion filed January 7, 1920.

*Railroads—Negligence—Voluntary Exposure to Known and Appreciated Danger—Assumption of Risk—Assent to Attendant Danger—Railroad Custom No Excuse.*

1. An experienced car inspector and repairman, having full knowledge and appreciation of the rules regarding the use of signals to protect repairmen while under and about a car in the performance of their duties and of the risks attendant upon his work, who voluntarily goes under a car standing on a track constantly used for switching purposes to repair it, without taking any precautionary measures for his safety, assumes the risk; and his administrator cannot recover for his death caused by the car being moved by the employees of another road while switching cars, although he was not an employee of such other road.

2. While the decedent, when killed, was where he had a right to be in the performance of his duties, and was entitled to such care on the part of the defendant, for his protection, as the law afforded him in the circumstances, yet this did not render the defendant liable for injury arising from danger to which, within the meaning of the maxim *volenti non fit injuria*, he voluntarily exposed himself.

3. In such case, the decedent's assent to incur the risk attendant upon his course of action dispensed with any duty by the defendant to exercise care.

4. The fact that the use of warning signals as required by the rules of the railroad had been waived by custom and usage, did not excuse the decedent from voluntarily and unnecessarily risking a known and obvious danger.

ACTION OF TORT for negligence. Plea, the general issue. Trial by jury at the September Term, 1918, Windham County,

*Butler*, J., presiding.    Verdict and judgment for the plaintiff. The defendant excepted.    The opinion states the case.

*J. W. Redmond* and *W. R. McFeeters* for the defendant.

*Barber, Barber & Miller* for the plaintiff.

WATSON, C. J.    This action, based on alleged negligence, is brought by the administrator, under the statute, for the benefit of the widow and the next of kin.    All the tracks and territory in the railroad yard at Brattleboro, south of Bridge Street, are the property of the defendant.    The yard of the Boston and Maine Railroad is north of Bridge Street, and not material to any issue in this case.    All the switching in Brattleboro yard, both that of defendant and of the Boston & Maine, was done by defendant's switch engine and its yard crew.    The two railroad companies kept at that place separate and independent combined car inspectors and repairmen.    Those of the Boston & Maine were decedent, foreman, and John Curry, his helper.    These two men were employed and paid by that company, did only its work, and were exclusively under its orders.    Whenever cars came into Brattleboro from the north or south over the road of the Boston & Maine, they were inspected by decedent, or under his direction by Curry, and if any repairs were needed, a note thereof was made.    Later, decedent and Curry found the car in the yard, and made the necessary repairs.

The main track is west of the freight house, also of the old passenger station.    There are several spur tracks east of the main track, extending north.    The northerly portion of one of these spur tracks, and governed by a certain switch, is known as the "general delivery track," and is used "for commercial purposes for unloading and reloading" freight cars, though such use is not exclusive.    On the west side of this track, and between it and the old passenger station and the freight house, is a passage way for people with teams or otherwise, having business at the freight house, or at cars standing on the "general delivery track," in loading and unloading freight.    This passage way is also used by people and teams going to or from warehouses and coal sheds located on the east side of this spur track.

It appeared that on Saturday, July 21, 1917, defendant's switching crew moved all cars from the "general delivery track"

so that it might be repaired on Sunday, and that thereafter no cars were on that track until about nine o'clock in the morning of the following Monday, at which time said crew placed three cars thereon, halting them in the space between a point 80 feet, and a point 180 feet, north of the switch governing that particular track. The south car of the three so placed was a box car, the middle car was loaded with coal, and the north car was loaded with windows. Thereupon the switch engine and crew went to what is known as the "scale track," and nosed onto the south end of a string of twelve cars there standing, and pushed them north onto the "general delivery track" and into collision with the three cars mentioned, at a speed of about four miles an hour. The three cars were thereby suddenly moved along on the track. The time which elapsed between the placing of these cars where they were standing and the collision was ten or twelve minutes. At the time of the collision, decedent and his helper were under the middle one of these cars, engaged in repairing it, and decedent suffered injuries from which he soon died. No other person was near those cars when the switching train was being pushed toward them, and neither the decedent nor his helper saw that train; nor did any of the switching crew see them, or have any reason to believe they were under or about the cars but a few minutes previously placed on that track.

At the close of the evidence, defendant moved that a verdict be directed in its favor on several grounds named, only one of which need be mentioned, namely, that on the evidence, viewed in the light most favorable to the plaintiff, the decedent assumed the risk of going beneath the cars in the circumstances, as he did, without taking any means of safeguarding himself against attending dangers. To the overruling of the motion defendant excepted.

Of the operating rules of the Boston & Maine Railroad, are the following: (26), "A blue signal, displayed at one or both ends of an engine, car or train, indicates that workmen are under or about it; when thus protected it must not be coupled to or moved. Workmen will display the blue signals and the same workmen are alone authorized to remove them. * * *" (983), "When inspecting or repairing cars which they (car inspectors and repairmen) do not wish moved, they must first display the proper signals as prescribed by Rule 26." These rules, or simi-

lar ones, have been in force on that railroad ever since June 21, 1909.

Rule 26 is a standard, adopted, in substance at least, by most of the railway companies in this country. The defendant company has a similar rule (of same number) which has been in force ever since June 18, 1911.

The signals thus required to be displayed by such inspectors and workmen, are intended for their safeguard from danger to which they would otherwise be exposed in the performance of their duties; and when displayed such signals constitute notice to switchmen that workmen are under or about the engine, car, or train so protected, and that such engine, car, or train (in the words of the Rule) "must not be coupled to or moved." Decedent had been furnished with, and at the time in question had in his possession at the tool house, blue flags to be used as such signals.

At the time of the accident, the decedent had worked in that same yard for the Boston & Maine Railroad, as foreman car inspector and car repairer, continuously for thirty-four years. Under him, Curry had worked as helper for eleven years. Decedent had that company's Rule Book, studied it, and was thoroughly conversant with the two rules shown and discussed above. In March, 1915, he and other repair foremen on the same division of that system of railroads, were called together by the Master Mechanic (in the line of his duties) and given instructions regarding their duties and protection under the two rules mentioned, and instructed that they must live up to them at all times; and in June, 1916, the decedent was sent a copy of a circular issued by the Superintendent of Motive Power, on the subject, "Protection for Repairmen," particularly calling "attention to the rules relative to furnishing protection to car repairmen in view of" a serious accident which had then recently occurred on another railroad. Rule 26 and the rule then in force similar to Rule 983, quoted above, were set forth in the circular. The copy of this circular sent to decedent, was found, after his death, among the files in the tool house, mentioned, where it was always kept by him after receiving it.

The undisputed evidence showed that switching was done in that yard every day, more generally in the morning from nine o'clock until noon, but sometimes later; that it was of frequent occurrence that cars were switched back and forth on

the "general delivery track"; that there was no rule whereby a car, when placed on that track, was placed to be unloaded where it stood; that in switching cars were frequently backed onto that track and then drawn out; and that almost daily, about nine or ten o'clock in the morning, such switching movements were made over it.

[1, 2]  On the morning of the accident, decedent and his helper, without taking any precautionary measures for their safety, went under the most southerly of the three cars standing on the "general delivery track," making repairs there occupying about five minutes of time, and thence under the middle car to put a bolt into the tie plate underneath the "draw rigging." It was when they were engaged in putting in this bolt that the collision took place and the decedent fatally injured. Considering decedent's long term of service as inspector and repairman in that yard, there can be no doubt that he had full knowledge concerning the several tracks, their accustomed use in switching cars, the time or times of day when switching was likely to be done, and the risks attendant upon his work when, in its performance, it was necessary to go under cars at rest on a track used for switching purposes. The importance of observing the mandate of the rules respecting precautionary measures, had twice been particularly called to his attention by his superiors in the same department of service, within two and one-third years, the later being by official circular within about a year and one month before his death. Giving the evidence the view most favorable to the plaintiff, the decedent knew and appreciated the dangers to which he was exposing himself in going under the cars to make the repairs at the time in question, without using the means of protection prescribed for use by repairmen in such circumstances. Instead of acting according to the official mandate in this behalf, he followed a course of his own choosing, one whereby he voluntarily went under the cars to make the needed repairs without safeguarding himself against imminent dangers in any manner whatsoever. Clearly the maxim *volenti non fit injuria* applies, and no recovery can be had. Article, 8 Harv. L. Rev. 457; *Latremouille* v. *Bennington & Rutland Ry. Co.*, 63 Vt. 336, 22 Atl. 656; *Dailey* v. *Swift & Co.*, 86 Vt. 189, 84 Atl. 603. Nor does the fact that the decedent was not an employee of the defendant change the result. As an employee of the Boston & Maine he was where he had a right to

be in the performance of his duties, and was entitled to such care on the part of the defendant, for his protection, as the law afforded him in the circumstances (*Sawyer* v. *Rutland & B. R. Co.*, 27 Vt. 370; *In re Merrill*, 54 Vt. 200; *Ingram's Admrx.* v. *Rutland R. R. Co.*, 89 Vt. 278, 95 Atl. 544, Ann. Cas. 1918 A, 1191); yet this does not render the defendant liable for injury arising from danger to which, within the meaning of the above maxim, he voluntarily exposed himself. *Drown* v. *New England Telephone & Telegraph Co.*, 80 Vt. 1, 66 Atl. 801; *Woodley* v. *Metropolitan District Ry. Co.* (opinion of Cockburn, C. J.), 2 Exch. Div. 384, 389.

The motion for a directed verdict should have been granted.

*Judgment reversed, and judgment for defendant to recover its costs.*

### On Motion for Reargument.

After the foregoing opinion was promulgated, the plaintiff was permitted to file a motion for reargument, the real ground of which is that the blue flag rule had been waived by the defendant so far as the "general delivery track" was concerned, and therefore it cannot be said that decedent assumed the risk of injury in going under the cars, as he did at the time in question, without putting up the blue signal.

[3]    It will be observed that the opinion is not based on a violation of that rule; but rather the rule is shown and discussed because, considering decedent's knowledge of it, and of its purpose, and the explicit instruction to him by his superior concerning its obeyance, it necessarily, with the other evidence, leads to the conclusion that the danger to which decedent exposed himself was to him known and obvious. The necessity of giving notice in some manner of his presence under the cars was essential to reasonable safety, and, making no endeavor in this respect, he acted at his peril. The fact that his presence there might be discovered by the switching crew in season to avoid injury by reason of such collision, is no answer to the position that he knowingly consented to incur the risk attendant upon his course of action. In law his assent dispensed with any duty by defendant to take care. *O'Maley* v. *South Boston Gaslight Co.*, 158 Mass. 135, 32 N. E. 1119, 47 L. R. A. 161; *Thomas* v. *Quartermaine* (opinion of Lord Justice Bowen), 18

Q. B. Div. (1887) 685; *Woodley* v. *Metropolitan District Ry. Co.* (opinion of Chief Justice Cockburn), 2 Exch. Div. 384; 8 Harv. L. Rev. 458, 459.

[4]    The asserted waiver is not claimed by the plaintiff to have been express or special, but as the result of custom and usage in connection with the particular track named. We may assume, though we do not decide, that the evidence was such as to warrant a jury in finding such a waiver; yet it does not affect the result reached in the opinion handed down. For custom and usage will not excuse the voluntary and unnecessary risk of a known and obvious danger, whether a rule exists or not. This was expressly held by the court of last resort in Alabama, in a case to recover damages for personal injuries, wherein the plaintiff sought to avoid the effect of a violation of (apparently) the same standard blue flag rule. *Alabama Great Southern R. Co.* v. *Roach,* 110 Ala. 266, 20 South. 132. With such a waiver assumed, the case of *Lalremouille* v. *Bennington & Rutland Ry. Co.,* 63 Vt. 336, 22 Atl. 656, is much in point, if not decisive on this question. There, so far as appears from the reported case, the railroad company had no blue flag rule, nor any rule answering the same purpose; but the deceased, a car inspector and repairer, was alone to determine the help he needed to make the required repair, and call for them. The only helper he had, if present, was holding the draw-bar in place while the deceased went under the car to put in a pin to hold it there. The latter called for no more or different help, and had no one to keep watch for a coming or moving train. When thus. under the car, a train was backed down on the same track, unseen and unheard, running the car over him, causing fatal injuries. It was held that the danger to which the deceased exposed himself was known and obvious, within the meaning of the law, and that he assumed the risk.

What we have said upon this motion only amplifies what is necessarily involved in the holdings made in the opinion; and the motion is denied.

*Judgment reversed, and judgment for defendant to recover his costs.*