ALEXANDER GOVER v. CENTRAL VERMONT RAILWAY COMPANY.

February Term, 1922.

Present: WATSON, C. J., POWERS, TAYLOR, MILES, and SLACK, JJ.

Opinion filed November 20, 1922.

*Railroads—Negligence—Proximate Cause—Contributory Negligence—Questions for the Jury—When Necessary to Charge on Subject of Assumed Risk in Addition to That of Contributory Negligence—Assumption of Risk—Application of Maxim, "Volenti Non Fit Injuria"—Necessity of Voluntary Act—Exceptions Not Raised Below—Right of Action of Mortgagor of Personal Property in Possession for Wrongful Injury Thereto—Harmless Error.*

1. In an action against a railroad company for injuries sustained when plaintiff's sled became stalled on a crossing thereof and was struck by defendant's train, whether the defendant was negligent respecting the construction of the crossing in the manner in which it was planked, *held*, on the evidence, for the jury.

2. Whether the planking of a railroad crossing, if found to be defective, was the proximate cause of the stalling of plaintiff's team thereon, resulting in plaintiff's sled being struck by defendant's train, *held*, on the evidence for the jury.

3. In an action against a railroad company to recover for injuries sustained at a crossing, where the highway crossed the railroad tracks at an acute angle, and the crossing was so planked that it was necessary for a team in crossing to deviate from the general course of the highway to keep on the planking, and plaintiff had no knowledge of this fact, and other conditions were such that the plaintiff could see nothing to indicate that the highway did not follow a straight course ahead, it cannot be said as a matter of law that plaintiff was negligent in driving off the planking at one end of the crossing, thereby stalling his sled.

4. In an action against a railroad company for injuries sustained at a railroad crossing where plaintiff's sled became stalled there-

on and was struck by defendant's train, whether defendant was negligent in the operation of its train, *held*, on the evidence, to be a question for the jury.

5. In such an action, a proper charge on the subject of contributory negligence will not suffice where the evidence is such as to make a case for the application of the doctrine of assumed risk.

6. While the doctrine of the assumption of risk in its primary and narrower sense applies only when a contractual relation exists, ordinarily that of master and servant, in the broader sense it may apply when no relation by contract exists within the limits of the maxim, "*volenti non fit injuria*," which is predicated upon the theory of knowledge and appreciation of the danger and voluntary assent thereto.

7. In an action against a railroad company for injuries sustained by plaintiff when his sled became stalled on a railroad crossing, and while he was attempting to unhitch one of his horses from the sled, *held*, that the circumstances disclosed by the evidence were such that his action could not be said to be voluntary in a legal sense but was measured by the standard of reasonable care, and that the trial court properly refused to instruct the jury on the subject of assumption of risk.

8. The Supreme Court will not consider in review a question argued before it relating to the charge of the trial court, but not raised by the exception taken below.

9. Where plaintiff's horses, one of which was injured at a railroad crossing accident, were covered by a mortgage on which a balance remained unpaid, the fact that the legal title to the injured horse was in the mortgagee did not affect plaintiff's right to maintain an action for its injury, for a mortgagor, if in actual possession, has a right of action against one who wrongfully injures the mortgaged property, unless the mortgagee has intervened for his own protection.

10. Although a portion of the charge may be erroneous, a reversal will not be granted where such error is harmless.

ACTION OF TORT for negligence. Plea, the general issue. Trial by jury at the September Term, 1921, Franklin County, *Butler*, J., presiding. Verdict and judgment for the plaintiff. The defendant excepted. The opinion states the case. *Affirmed.*

*J. W. Redmond* and *W. R. McFeeters* for the defendant.

*M. H. Alexander* for the plaintiff.

TAYLOR, J.   The plaintiff alleges negligence resulting in defendant's train colliding with his team at a grade crossing from which he suffered personal injuries and damage to property. The trial was by jury with verdict and judgment for the plaintiff.   The negligence claimed consisted of the alleged insufficiency of the crossing, in that it was not properly planked, and failure of the engineer in not seasonably stopping the train after he knew, or ought to have known, of plaintiff's peril.

At the close of the evidence the defendant moved for a directed verdict on several grounds.   The exceptions saved to the overruling of the motion and to the charge present the principal questions for review.   For the most part there was no controversy in the evidence.   The crossing in question is about one mile north of Georgia station.   The highway of which the crossing is a part is not much traveled, and crosses the railroad track diagonally in an easterly and westerly direction.   The accident occurred at about six o'clock in the evening of December 11, 1920. It was quite dark and had been snowing and the wind blowing so that the snow was drifted over the roadway in the vicinity of the crossing.   It so covered the track of teams in the vicinity that the plaintiff could not see the crossing.   He was engaged in moving his daughter's household furniture from Georgia to Fairfax and had a span of horses attached to a pair of travers sleds, the load weighing about 2,800 pounds.   At the time of the accident the plaintiff was going easterly over the crossing.   The highway at that point crosses the track at an acute angle, the two being nearly parallel for some distance on either side of the crossing. As the crossing was planked, a team approaching it from the west had to turn to the left as it drove onto the crossing, and to the right as it was leaving it, to keep on the planking.   Even then the course of travel over the crossing was nearer the south end than the north end of the planking.   In other words, if the driver of a team followed the general course of the highway without turning he would drive off the south end of the planking. This is what happened to the plaintiff as he attempted to make the crossing.   He followed the general course of the highway

without turning and got off the south end of the planking. The rear sled caught on the west rail in such a manner that the load became stalled and could not be moved. While attempting to get the sled off the crossing the plaintiff discovered the train approaching from the south. The track in that direction is straight for about 1,900 feet from the crossing. The first warning the plaintiff had of the approach of the train was the reflection of the headlight as the train reached a curve some distance farther south. He ran down the track between the rails a short distance with a lighted lantern and waived the lantern across the track as a signal for the train to stop. He then dropped the lantern, ran back to the team, and attempted to unhitch the horses. He had unhitched one horse and was attempting to free the other when the train struck the sled, causing the damage complained of. The train, consisting of the locomotive, two passenger coaches, and a baggage car, was not stopped until the rear end was about 120 feet north of the crossing. It was running about thirty miles an hour when the brakes were applied. The collision demolished the sled and injured the horse that was still attached to it. The plaintiff also received personal injuries for which he sought to recover.

[1-3]    One ground of the motion was that there was no evidence tending to show negligence on the part of the defendant respecting the construction of the crossing. But we think the evidence made that a jury question. It is said that "the crossing was planked with the travel and as the crossing was used." However, it was not planked as travel would naturally go, and it may well be that the planking was the cause, and not the result, of the usual course of travel over the crossing. It was for the jury to say whether, in the circumstances, the planks should not have been differently placed. It is urged as another ground of the motion that there was no evidence tending to show that any defect in the crossing caused the plaintiff's team to be stalled thereon. Whether the defective planking of the crossing, if so found, was the proximate cause of the team's being stalled, was, on the evidence, clearly a question for the jury. Considering the angle at which the runner that was off the planking struck the rail the position taken by the rear sled was perfectly natural and did not, as defendant argues, indicate that the sled was not properly constructed. Nor can it be said as matter of law that

the stalling on the crossing was due to negligent driving. The plaintiff was not familiar with the crossing, though he had passed over it earlier the same day. The snow that had fallen and drifted over the roadway concealed the tracks of travel, which otherwise would probably have indicated to him the course to be taken over the crossing. He was carrying a lighted lantern, but with its aid could see nothing to show that the road did not follow a straight course ahead. It must be held that the court did not err in submitting to the jury the question of the defendant's negligence respecting the maintenance of the crossing.

[4] Other specified grounds of the motion raise the question whether there was any evidence tending to show the claimed negligence in operating the train. It must be conceded that the defendant's evidence strongly indicated that the engineer did everything possible to stop the train after he became aware of the plaintiff's dilemma. The engineer testified that he saw the signal to stop given by the plaintiff and immediately shut off steam and applied the full emergency brake; and that the train was then about fifteen rods from the crossing. This testimony was corroborated by the other trainmen. But the evidence on this branch of the case was conflicting. The plaintiff's evidence tended to show that the signal to stop was given when the train was at least 1,900 feet from the crossing and that the speed was not slackened as the train approached. The distance within which the train could have been stopped did not appear, but it was conceded that it could have been stopped in less than 1,900 feet. On the evidence, considered in the light most favorable to the plaintiff, the question could not be ruled as a matter of law, but was properly submitted to the jury. The signal to stop was seen and understood by the engineer. If given when the plaintiff's evidence tended to show it was, there could be no doubt that the jury would be justified in finding that the failure to stop the train and avoid a collision was due to negligence chargeable to the defendant.

[5] At the trial the defendant claimed that, so far as injury to himself was concerned, the plaintiff assumed the risk when he undertook to unhitch the horses with the train "right on him," and excepted to the failure of the court to charge on that phase of the case. The evidence was conflicting as to where the train was when the plaintiff got back to the team after giving

the signal for the train to stop. However, there was evidence tending to show as the defendant claimed in that regard. The court charged fully with respect to contributory negligence; but a proper charge on that subject would not suffice, if the evidence made a case for the application of the doctrine of assumed risk. *Mundle* v. *Hill Mfg. Co.*, 86 Me. 405, 30 Atl. 16; *Miner* v. *Conn. R. R. Co.*, 153 Mass. 398, 26 N. E. 994.

It is now generally recognized that there is a distinction between the doctrine of contributory negligence and the doctrine of assumption of risk. Note 18 Ann. Cas. 960. While this was left an open question in *Drown* v. *New England Tel. & Tel. Co.*, 80 Vt. 1, 16, 66 Atl. 801, the existence of such a distinction has come to be recognized by this Court. *Carleton* v. *Fairbanks Co.*, 88 Vt. 537, 548, 93 Atl. 462; *Pette's Admr.* v. *Old English Slate Quarry*, 90 Vt. 87, 93, 96 Atl. 576; *Robey* v. *Boston & Maine R. R.*, 91 Vt. 386, 100 Atl. 925. The occasion for considering the distinction so seldom arises, except with respect to the relation of master and servant, that it seems to have been quite generally understood that the doctrine of assumption of risk is confined to cases arising out of that relation. Some courts hold that the doctrine has no application in actions for negligence where the parties do not occupy a contractual relation. Among the cases so holding are *Conrad* v. *Springfield Con. Ry. Co.*, 240 Ill. 12, 88 N. E. 180, 130 A. S. R. 251; *City of Linton* v. *Maddox* (Ind. App.), 130 N. E. 810; *McGeever* v. *O'Bryne*, 203 Ala. 266, 82 So. 508; *Campbell* v. *Railway Tr. Co.*, 95 Minn. 375, 104 N. W. 547; *Wilkins* v. *Water & Light Co.*, 92 Neb. 513, 138 N. W. 754. Other courts regard the distinction, at least in cases not affected by a contractual relation, as purely theoretical, holding that in its practical application to such cases the doctrine of assumption of risk necessarily involves that of contributory negligence. See *United Rys. & Elec. Co.* v. *Riley*, 109 Md. 377, 71 Atl. 970; 18 R. C. L. 675. Still other courts hold that, independently of any contractual relation, there may be a voluntary assumption of the risk of a known danger such as will bar one from recovery for injury to person or property, even though in the exercise of due care. *Miner* v. *Connecticut River R. Co.*, 153 Mass. 398, 26 N. E. 994; *Indiana Nat. Gas Co.* v. *O'Brien*, 160 Ind. 266, 65 N. E. 918. This Court is committed to the latter view. *Drown* v. *New*

*England Tel. & Tel. Co.,* 80 Vt. 1, 66 Atl. 801; *Lavelle's Admr.* v. *Central Vermont Ry. Co.,* 94 Vt. 80, 108 Atl. 918.

[6]    It has been observed that few subjects of the law have a more obscure and complicated terminology than that pertaining to the doctrine of assumption of risk.    18 R. C. L. 671.    It is believed that much of the confusion to be found in the cases dealing with the question presented here arises from a failure to distinguish carefully the two phases of the doctrine of assumed risk, or to keep in mind the different senses in which the term is used, as to which see *Carleton* v. *Fairbanks Co.,* 88 Vt. 537, 549, 93 Atl. 462.    In the primary and narrower sense the doctrine can apply only when a contractual relation exists, ordinarily that of master and servant.    But in the broader sense it may apply when no relation by contract exists within the limits of the maxim *"volenti non fit injuria."*    If one knowing and comprehending the danger voluntarily exposes himself to it, though not negligent in so doing, he is deemed to have assumed the risk and is precluded from a recovery for an injury resulting therefrom. The maxim is predicated upon the theory of knowledge and appreciation of the danger and voluntary assent thereto.

If the application of the maxim *"volenti non fit injuria"* is recognized as extending beyond contractual relations, the limitations of the doctrine of assumption of risk based thereon must be looked for in the terms of the maxim itself.    Any other course would be illogical, and the limitation could not escape being purely artificial.    Courts that have adopted the contractual limitation have experienced this difficulty.    Tested by the maxim, what are the limitations of the doctrine as applied to the case in hand?    It is said in *Warren* v. *Boston & Maine R. R.,* 163 Mass. 488, 40 N. E. 895, that the doctrine of assumption of risk, as distinguished from the doctrine of reasonable care, in an action between persons not having relations by contract, must be confined to cases where the plaintiff knew and appreciated the danger and voluntarily put himself in the way of it.    To the same effect is *Gentzkow* v. *Portland Ry. Co.,* 54 Or. 114, 135 A. S. R. 821; *Illingsworth* v. *Boston Elec. Co.,* 161 Mass. 583, 37 N. E. 778, 25 L. R. A. 552.    It is not enough that the plaintiff knew and appreciated the danger.    Was it a voluntary act within the meaning of the maxim?    To be voluntary an act must be done of one's own free will.    The word emphasizes the idea of freedom

from constraint. Webster's New Int. Dic. The true meaning of the *volens* of the maxim is referred to as "intelligent choice" in *Thomas* v. *Quartermaine,* 18 Q. B. Div. 685; and the same idea is aptly expressed in *Chicago, etc., R. Co.* v. *Lewis,* 103 Ark. 99, 145 S. W. 898, where it is said that the doctrine is based on voluntary exposure to a known danger, and can be applied only when a person may "reasonably elect" whether or not he shall expose himself to it. We said in *Carbine's Admr.* v. *Bennington & Rutland R. Co.,* 61 Vt. 348, 17 Atl. 491, which was a master and servant case, that the doctrine applied if the servant "knowingly and *deliberately* assumes a risk that leads him into immediate danger." In effect the English cases hold that mere knowledge of the risk does not necessarily involve consent to the risk; and that the maxim does not apply on the mere showing of knowledge of the danger, but only where the circumstances are such as warrant the inference that the plaintiff encountered the risk freely and voluntarily with full knowledge of the nature and extent thereof. *Thomas* v. *Quartermaine, supra; Yarmouth* v. *France,* 19 Q. B. Div. 647; *Smith* v. *Baker,* 60 L. J. (N. S.) 683; Broom's Legal Maxims (7th ed.) 219. Lord Chancellor Halsbury expresses the opinion in *Smith* v. *Baker* that, in order to defeat a plaintiff's right by the application of the maxim, when he would otherwise be entitled to recover, the jury ought to be able to affirm that he consented to the particular thing being done which would involve the risk, and consented to take the risk upon himself.

[7] We think it cannot be said there was evidence to support an inference that the plaintiff voluntarily assumed the risk. He testified in cross-examination that after giving the signal and when he saw the train wasn't going to stop he ran back to the team to save the horses; that when he got to the team the train was "right onto" him; that he had unhitched the tugs of the nearest horse (the one that was not injured) and was attempting to unhitch the tugs of the other horse when the train struck the sled; that he was standing about five feet from the nearest rail, and that the horses were still farther from the track. There was also evidence tending to show that the plaintiff told his daughters, who were holding the horses, to get out of the way. That the evidence tended to show knowledge and appreciation of the danger is apparent. The infirmity of the defendant's

claim is the lack of evidence fairly tending to show that the plaintiff undertook the risk *voluntarily.* His willingness to incur the risk could not in the circumstances reasonably be inferred from knowledge of the danger, as other circumstances negative such an inference. *Dunkerly* v. *Webendorfer Mach. Co.,* 71 N. J. Law 60, 58 Atl. 94, quoted with approval in *Dailey* v. *Swift & Co.,* 86 Vt. 189, 194, 84 Atl. 603. He was required to act in an emergency created by the defendant's negligence. There was no time for deliberation, nor opportunity for the exercise of a will unconstrained by outside influences. Apart from motives of self interest, it was his duty to use all reasonable means to protect the horses from injury. *Lloyd* v. *Jones,* 60 Vt. 288, 13 Atl. 683. In such circumstances his action could not be said to be voluntary in a legal sense but is to be measured by the standard of reasonable care, which was the test applied by the trial court. It is unnecessary to consider whether the plaintiff would be entitled to the benefit of the rule adopted by some courts that the doctrine of assumed risk does not apply to one injured in an effort to save his property exposed to danger by the negligence of another, redress being denied only when the effort has been such as a prudent man would not have made under similar circumstances. Since the evidence did not make a case for the application of the doctrine of assumed risk as distinguished from contributory negligence, the court properly declined the request to charge.

[8] The defendant argues an exception to the charge respecting the degree of care required of the plaintiff in the "emergency" in which he found himself. In taking the exception, counsel admitted that if the emergency was brought about by the negligence of the defendant, fault could not be found because the plaintiff "didn't exercise special care" in the emergency; and in their brief they say that if the emergency was brought about by the defendant's negligence the charge might be justified "on the well-settled ground that a defendant cannot be too exacting as to the conduct of a plaintiff in an emergency wrought by defendant's negligence." The claim relied upon in taking the exception was that if the emergency was due to plaintiff's own negligence, or at least was not due to any fault of the defendant, then the plaintiff was bound to exercise the care of a prudent man in the circumstances—not what he

thought was right, but what a prudent man would have thought in the circumstances was right.    The point now relied upon is that if the emergency was owing wholly to plaintiff's negligence, as. defendant claimed was conclusively showed by evidence, it was error to submit whether a prudent man would imperil his life to save his property when the train was "right on him."    It is enough to say that the question argued was not the question raised by the exception.    *Bradley* v. *Blondin,* 94 Vt. 243, 255, 110 Atl. 309; *Underwood* v. *Cray,* 94·Vt. 58, 108 Atl. 513.

[9, 10]    It had appeared in evidence that plaintiff's horses with some other property was covered by a mortgage on which a balance remained unpaid.    In view of something said in argument about there being a mortgage upon the horses, the jury were told that they had nothing to do about this; that the plaintiff would be entitled to recover whatever damage was suffered by reason of injury to the horse, whether there was a mortgage or not; that the title to the horses was in the plaintiff and he had a right to mortgage them as security for a debt or not, "you have nothing whatever to do with that."    The exception taken was to the charge of the court in respect of the mortgage and its force, and especially to that portion of the charge wherein it is said that the title to the property was in the plaintiff.    Counsel assert in their brief that the court erred in its instruction as to the effect of the mortgage on the horses, but say no more in support of the claim than that the title to the horses was in the mortgagee, with the right of immediate possession; and that plaintiff's right therein was only an equity of redemption.    Their contention in that regard may be conceded and is supported by the cases cited.    But the fact that the legal title to the injured horse was in the mortgagee does not affect the plaintiff's right to maintain this action for its injury.    It is generally held that a mortgagor, if in actual possession, has a right of action against one who wrongfully injures the mortgaged property, unless the mortgagee has intervened for his own protection.    Jones on Chat. Mtg. § 447a; *Woodruff* v. *Halsey,* 25 Mass. (8 Pick.) 333, 19 A. D. 329; *Wilkes* v. *Southern Ry. Co.,* 85 S. C. 346, 67 S. E. 292, 137 A. S. R. 890; *Southern Ry. Co.* v. *Chambless,* 10 Ala. App. 326, 65 So. 417; *Ex parte Southern Ry. Co.,* 187 Ala. 672, 65 So. 1034; *Chicago, etc., Ry. Co.* v. *Earl,* 121 Ark. 514, 181 S. W. 925, Ann. Cas. 1917 D, 552; *Swank* v. *Elert,* 55 Or. 487, 105

Pac. 901; *Wohlwend* v. *Threshing Mach. Co.*, 42 Minn. 500, 44 N. W. 517; note 21 Ann. Cas. 80. The court very properly told the jury that they were to disregard the mortgage. The error in the charge respecting the matter of title being harmless does not require a reversal.

*Judgment affirmed.*