MRS. BERTHA WOOD ET AL V. KANE BOILER WORKS, INCORPORATED.

No. A-2909. Decided March 7, 1951.
Rehearing overruled April 18, 1951.
Second motion for rehearing overruled May 23, 1951.
(238 S. W., 2d Series, 172.)

*Armstrong, Barker, Bedford & Lambdin, Williams & Thorton* and *Bryan F. Williams*, all of Galveston, for petitioners.

The Court of Civil Appeals erred in holding that respondent, Kane Boiler Works, was under no duty to plaintiff's husband, as the inspector of the pipe for his employer, to exercise any care to safeguard him from the injuries inflicted and which the jury found resulted from the negligence of the defendant in sending forth for a hydrostatic test a section of pipe in which there was a hidden danger created by the servants of the manufacturer in welding same on a machine with which plaintiff's deceased husband had nothing to do, and in no way supervised. Said court also erred in holding that in making said inspection the deceased husband of plaintiff assumed the risk incident to

the job of inspecting. El Paso Printing Co. v. Glick, 246 S.W. 1076; Eggen v. Hickman, 274 Ky. 550, 119 S.W. 2d 633; Smith v. Henger, 148 Texas 456, 226 S.W. 2d 425; McAfee v. Travis Gas. Corp., 137 Texas 314, 153 S.W. 2d 442.

*Bleecker L. Morse* and *Wigley, McLeod, Mills & Shirley,* and *Preston Shirley,* all of Galveston, for respondent.

Since it was the duty of the inspector to ascertain any defect in the welded pipe, respondent was under no obligation to furnish a perfect pipe for his inspection, and no recovery could be had for his injury, he having assumed the risk for such danger. Magnolia Petroleum Co. v. Ray, 187 S.W. 1085, writ of error refused; Gaines v. Grand Trunk Ry. Co., 193 Mich 398, 159 N. W. 542; Anderson v. Howe Scale Co., 90 Vt. 244, 97 Atl. 992; Dartmouth Spinning Co. v. Achard, 84 Geo. 14, 105 S.E. 449, 6 L.R.A. 190.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

Mrs. Bertha Wood, petitioner, sued Kane Boiler Works, Inc., respondent, for damages for the death of her husband, Ralph Wood. Liberty Mutual Insurance Co., also a petitioner, intervened, alleging that as insurer of Pittsburg Laboratory of Texas, employer of Ralph Wood, it had paid a Workmen's Compensation award to Mrs. Wood and was subrogated to that extent to any recovery adjudged to her.

A trial court judgment for petitioners was reversed by the Court of Civil Appeals and rendered for respondent. 232 S. W. 2d., 866.

Lone Star Gas Company engaged respondent to fabricate and weld 10 miles of 20-inch steel pipe from plate furnished by the former and to be of such specifications as to permit a hydrostatic test pressure of 1000 pounds per square inch. The pipe was to be in lengths of 30 feet, each made from two sections of 15 feet "girth welded by the fabricator". The contract provided: "The finished pipe shall be * * free from injurious defects, such as defective welds, pits, blisters, slivers, and laminations. The welding of injurious defects shall be permitted on approval of purchaser's inspectors, after chipping to clean metal. The repairing of sweats or leaks in the welds shall be permitted on approval of purchaser's inspectors, after chipping to clean metal. * * * Each length of repaired pipe shall be subjected to a hydrostatic test pressure of 1000 p. s. i. * * * It is

understood that in fabricating this pipe your operations will involve sizing the plate by flame-cutting, forming the plate on 16' rolls, welding the longitudinal seam, using the unionwelt submerged arc process * * *, and finally testing each joint by hammering with 2-pound hammer along entire lengths of all welds while at 1000# pressure".

To do its inspecting Lone Star Gas Company employed Pittsburgh Testing Laboratories of Texas, which, in turn, hired the deceased, Ralph Wood, as night inspector.

In the early evening of November 26, 1948, Wood was at the testing machine set up on respondent's premises and operated by its employees inspecting a section of pipe which respondent had rolled, fabricated and welded, when he found a leak in the pipe and ordered the defect chipped out and rewelded. After he had approved the rewelding, water was turned into the pipe for the hydrostatic test. When the pressure reached 980 pounds the pipe burst immediately in front of Wood, who was standing very close, and the escaping water struck him with such force as to throw him on top of a fence, which was 5 feet high and some 15 feet away. He died shortly, from his injuries.

Mrs. Wood alleged many acts of negligence against respondent, among which were: it failed to make, roll and fabricate the pipe in a careful manner; it failed to weld the seam on the pipe in a careful manner; it failed to operate the welding machine used to weld the seam in a prudent and workmanlike manner; it underwelded and overwelded the seam in a careless and negligent manner; it failed properly to center the underweld on the seam; it failed to center the overweld on the seam; it failed to use a gauge to assure that the weld, while being applied to the seam of the pipe, was on the center of the seam; and it failed to use ordinary and careful means to determine whether the weld was properly centered and properly applied before testing the pipe.

The jury found: (1) that the rupture in the pipe which caused the death of Wood occurred along the seam of the pipe (seam being defined to them as "that portion of the pipe where the two edges of the steel plate out of which the pipe was being fabricated were drawn together"); (2) that the pipe ruptured at that point because union welt had not been applied at that point; (3) that at the point of rupture the union welt was not centered over the seam; (4) that there was an insufficient weld at the seam at the point where the rupture occurred; (5) that

respondent was negligent in failing properly to apply the union welt to the seam at the point of rupture, (6) which negligence was a proximate cause of Wood's death; (7) that in failing to center the union welt over the seam respondent was guilty of negligence, (8) which was a proximate cause of Wood's death; (9) that in applying an insufficient weld to the seam at the point of rupture respondent was guilty of negligence, (10) which was a proximate cause of Wood's death. It found that Wood's death was not due to an unavoidable accident and absolved Wood of numerous charges of contributory negligence.

Petitioners urge but two points of error and the application was granted on both. The first is that the Court of Civil Appeals erred in holding "as a matter of law that, because Wood was employed to see that the pipe to be delivered by Respondent to Lone Star Gas Company met the required hydrostatic tests, Respondent was under no duty to him to exercise any care to safeguard him from the injury inflicted upon him which the jury has found proximately resulted from the negligence of Respondent, in sending forth for a hydrostatic test a section of pipe in which there was a hidden danger to him negligently created by Respondent's servants in welding the pipe on the welding machine with which Wood had nothing to do, and which he was under no duty of supervising." The second point complains of the holding by the Court of Civil Appeals that, under those circumstances, he assumed the risk of injury.

■ The doctrine of assumed risk applies only in cases of master-servant relationship. West Texas Utilities Co. et al. v. Renner et al. (Com. App.), 53 S. W. 2d 451, opinion approved. Hence, although any distinction between the two points of error would seem to be of little substance, we shall examine the question of respondent's liability on basis of whether it owed Wood any duty not to injure him, as presented by the first point.

The doctrine of no duty is said to rest on the maxim *volenti non fit injuria*, which means "that to which a person assents is not esteemed in law an injury." Levlon et ux. v. Dallas Ry. & Terminal Co. (Civ. App.), 117 S. W. 2d 876, error refused. It means that the injured party consented to the act or omission which caused his injury and which, without such consent, would be a legal wrong. White v. McVicker, 216 Iowa, 90, 246 N. W., 385. An excellent discussion and application of the maxim appears in Walsh v. West Coast Coal Mines, 31 Wash. 2d 396, 197 Pac. 2d 233.

In 65 C.J.S., p. 848, sec. 174, it is said, "While it has been held that the doctrine of assumption of risk, in its primary or usual meaning, is limited to controversies between master and servant and is not applicable in the absence of any contractual relation between the parties, there is ample authority for the view that in its broader sense the doctrine of assumption of risk may extend beyond contractual relations * * *. In any event, when plaintiff has brought himself within the operation of the maxim, Volenti non fit injuria, he cannot recover. The doctrine discussed herein, by whatever name it may be designated, is said to rest on, or be in its nature, effect and import the equivalent at least of, the principle expressed by the maxim, Volenti non fit injuria, which is itself predicated on the theory of knowledge and appreciation of the danger and voluntary assent thereto. * * * The mere encountering of a risk, does not, legally speaking, constitute assumption of risk; *it is only when the risk exists in spite of the exercise of due care or when the risk results from negligence which is obvious that it is assumed by the person injured.*" (Italics ours.) And see Gila Valley G. & N. R. Co. v. Hall, 232 U.S. 94, 34 Sup. Ct. 229, 58 L. Ed. 521; Landrum v. Roddy, 143 Neb. 934, 12 N.W. 2d 82, 149 A.L.R. 1041.

In Gover v. Central Vermont Ry. Co., 96 Vt. 208, 118 Atl. 874, the Supreme Court of Vermont says that since the maxim extends beyond contractual relations, the limitations of the doctrine of assumption of risk based thereon must be looked for in the terms of the maxim itself; that any other course would be illogical and the limitations could not escape being purely artificial; that, therefore, the doctrine of assumed risk, in an action between persons not having relations by contract, must be confined to cases where the plaintiff knew and appreciated the danger and put himself in the way of it of his own free will and as the result of an "intelligent choice". In support of this conclusion the court then observes: "In effect the English cases hold that mere knowledge of the risk does not necessarily involve consent to the risk, and that the maxim does not apply on the mere showing of knowledge of the danger, but only where the circumstances are such as warrant the inference that the plaintiff encountered the risk freely and voluntarily with full knowledge of the nature and extent thereof. Thomas v. Quartermaine, supra (18 Q.B. Div. 685); Yarmouth v. France, 19 Q.B. Div. 647; Smith v. Baker, 60 L.J. (N.S.) 683; Broom's Legal Maxims (7th Ed.) 219. Lord Chancellor Halsburg expresses the opinion in Smith v. Baker that, in order to defeat a plaintiff's right by the application of the maxim, when he would other-

wise be entitled to recover, the jury ought to be able to affirm that he consented to the particular thing being done which would involve the risk, and consented to take the risk upon himself."

Under its contract with Lone Star Gas Company, respondent agreed to take metal plate furnished by the former, roll it into pipe of given dimensions and weld the seam where the two ends of the plate came together so that the pipe would be free of "defective welds, pits, blisters, slivers and laminations" to the extent that it would withstand an inside water pressure of 1000 pounds per square inch. It agreed that the finished pipe, when so rolled and welded that it would survive this pressure test, should be submitted for approval to Lone Star Gas Company's inspectors. It knew that these inspectors would have nothing whatever to do with rolling and fabricating the pipe or with welding its seams preparatory to its inspection. It knew that under established inspection practice water would be run into the pipe by its own employees to disclose to the inspector any "defective welds, pits, blisters, slivers and laminations" after which any such defects would be chipped to clean metal and the pipe rewelded at the point of defect by its own employees for approval or rejection by the inspector; that after this was done water would be turned into the pipe by its own employees until a pressure of 1000 pounds per square inch was attained, after which its employee would strike along the entire weld of the pipe with a 2-pound hammer with the inspector following, with his head very close to the pipe, looking and listening for defects. Wood, as inspector, was in that very situation when the pipe burst and killed him.

Can it reasonably be said that when Wood accepted employment to make such an inspection he voluntarily and by the exercise of an "intelligent choice" agreed to the acts and omissions in welding the pipe of which the jury found respondent guilty and which proximately caused his death?

It is clear that these acts and omissions produced a defect in the pipe which was not revealed to Wood by the inspection he made preceding the chipping out and rewelding. That is, they created a latent defect. The burst pipe was offered in evidence as an exhibit and is here with the record. We have examined it and are convinced that its rupture in the second test did not occur at any point where the chipping out and rewelding was done after the preliminary test. This is confirmed by the testimony of respondent's witness, Evers, who as its employee

did the rewelding after the preliminary test had shown a defect in the pipe and who was standing beside Wood when the pipe burst. He testified that after another employee of respondent's had chipped out a "V" at the point of defect through the original union melt and almost through the pipe he, Evers, put on six beads of weld; that he could not tell "from the V'd-out place whether the original union melt was off center or not", that is, "if the uinon melt was off center in the first instance at the place that you hand-welded here and Mr. Leo Schultz had chipped down there with this diamond-point drill and chipped a 'V' in there, he would have chipped right into where the old union melt had been and you would never be able to see that the other side of the pipe wasn't fused by the original union melt"; that the pipe did not rupture in the V groove which he hand welded but "at the seam between the two edges of the pipe" about 3/8 of an inch "from the center of my weld"; that it appeared that the original union weld was off center, for which reason "there was no fusion or penetration of that union melt with that metal"; that, because the original union weld was off center, there was no proper underweld; and that, therefore, it appeared that "the union melt, when originally applied, had burned through the metal instead of going down the seam between the two edges of the pipe, had burned through the metal on this east side of the seam."

The fact that Wood was under no duty to repair defects in the pipe distinguishes this from numerous cases cited by respondent involving either the independent contractor or master-servant relationship and holding no liability. They are cases wherein the injured party was present *to repair* or *to inspect and repair* and had equal or better opportunity to discover the defect which injured him than the defendant had, as in Lucas v. South. Ry. Co., 1 Ga. App. 810, 57 S.E. 1041. In them the injured party had notice of defects, hence the defendant owed him no duty as to them, as in Byars v. Moore-McCormack Lines, Inc., 2 Cir., 155 Fed. 2d 587, 588; or, the injury was caused by the very condition which the plaintiff was employed to correct and was in the act of correcting when injured, as in Broecker v. Armstong Cork Co., 128 N.J.L. 3, 24 Atl. 2d 194; or, plaintiff knew that defendant had no other employee charged with the duty, the omission to discharge which produced the condition which caused his injuries, as in Dartmouth Spinning Co. v. Achard, 84 Ga. 14, 10 S.E. 449, 6 L.R.A. 190. Other cases of this sort relied upon by respondent are: Hines v. Martel Telephone Co., 127 Neb. 398, 255 N.W., 233; Walsh v. West Coast Coal Mines, 31 Wash. 2d 396, 197 Pac. 2d 233;

Anderson v. Howe Scale Co., 90 Vt. 244, 97 Atl., 992; Feldewerth v. Great Eastern Oil Co. (Mo. Ct. App.), 149 S. W. 2d 410; Reed v. Moore & McFerrin (6th C.C.A.), 153 Fed., 358, 25 L.R.A. N. S. 331; Wahlquist v. Maple Grove Coal & Mining Co., 116 Iowa 720, 89 N.W., 98; Broderick v. St. Paul City Ry. Co., 74 Minn. 163, 77 N.W., 28.

The principle of knowledge of defect or of equal or better opportunity for knowledge of defect which these and other cited authorities involve is illustrated in Noftz v. Baltimore & O. Ry. Co., 6 Cir., 13 F. 2d 389, wherein the timber, the defect in which caused plaintiff's injury, was inside the wall of a box car and removal of the wall planks was necessary before he could make the repairs which he was employed to make, and it was held that plaintiff was injured by a defect which defendant could not discover except by plaintiff's investigation, hence defendant owed him no duty with respect to it. In Brucker v. Matsen et al., 18 Wash. 2d 375, 139 Pac. 2d 276, in discussing assumed risk, the court observed that, although the defendants may have been negligent in every respect alleged by plaintiff, the latter "had full knowledge thereof" while he was assisting defendants' agent and could not "close his eyes to perils thus created and recover for injuries sustained by reason of exposure of himself to such hazards"; that since his "knowledge of the danger equaled that of respondents (defendants), no liability is predicable of the injury proximately resulting therefrom." Again, in De La Pena v. Moore-McCormack Lines, Inc., 84 Fed. Supp., 698, plaintiff was an employee of an independent contractor engaged in cleaning up defendant's ship. He slipped on a pile of metal strips lying on the deck and fell back into a trench that surrounded the hatch. The court held that he could not recover because he was employed to clean up the strips along with everything else loose on the deck and the trench was open and obvious. A case dealing with equal opportunity for knowledge of defect is Campbell v. Rockland Trust Co. et al. 311 Mass. 663, 42 N. E., 2d, 586. That the respective duties of plaintiff and defendant must be considered in determining assumed risk even where plaintiff had equal opportunity with defendant to discover danger was held by this court in Peck v. Peck, 99 Texas, 10, 87 S. W. 248.

Substantial limitations upon the doctrine of no duty or of assumed risk invoked by respondent are recognized by the Fifth Circuit Court of Appeals in the case of Amacker et al. v. Skelly Oil Co., 132 Fed. 2d 431. In that case Amacker, as the employee of an independent contractor, was asphyxiated while

engaged in cleaning basic sediment from an oil tank belonging to Skelly Oil Company. His widow sued for damages alleging that Skelly was negligent in not seeing that the tank was free of asphyxiating gas or in not providing Amacker with protection therefrom. Skelly pleaded contributory negligence and assumed risk and that any duty to furnish safety appliances rested on Amacker's employer, the independent contractor. The trial court instructed a verdict for Skelly. Reversing and remanding the cause, the Circuit Court of Appeals said: "Appellee (Skelly), not disputing that a duty of due care may be owing to an invitee, the servant of an independent contractor, coming on premises to work, insists that this case is ruled by the principle announced in Armour & Co. v. Dumas, 43 Texas Civ. App. 36, 95 S. W. 710, 711; Kuptz v. Sollitt & Sons Construction Co., 5 Cir., 88 F. 2d 532; and like cases, that an owner is not liable for injuries caused by the changing character of the work where the very dangers to be anticipated inhere in and necessarily arise from the work to be done. * * It would serve no useful purpose to canvass and discuss the many authorities appellant and appellee cite. It is sufficient to say that *the doctrine appellee invokes does not apply to this case where the work is static and precautions against injury from it can be easily taken.* Cf. Montgomery v. Houston Textile Mills, supra (45 S. W. 2d 140), and Carey Reed Co. v. McDavid, 5 Cir., 120 F. 2d 843." (Italics ours.) This holding evidently proceeds on the proposition that the defendant had opportunity to know of defects and therefore to remedy them before they created a hazard for the plaintiff.

In this case the work respondent was doing was static, except that it moved from one piece of plate, or skelp, to another. The rolling of the plate and the welding of the seam was done in exactly the same way on each pipe; there was a way prescribed by the industry which, if observed, would insure that the seam resulting from rolling of the two ends of the plate together could be so fused by welding along the center of the seam that the pipe would withstand the 1000-pound-per-square-inch pressure which respondent knew was to be applied in the inspection shortly to be made by Wood on its premises and with the aid of its own employees; and there was a gauge test which it had agreed to use and which it could quickly and easily make after welding this seam to determine whether the weld had been properly centered and properly applied. Yet respondent failed so to weld the pipe and its failure produced a defect— lack of fusion at the seam—which its own employee could not see after the pipe had been chipped and "V-grooved" for rewelding at the direction of Wood following the preliminary inspec-

tion. Under those circumstances it cannot be said that Wood had either actual or implied knowledge of the specific defect, so we are unwilling to hold that he of his own free will and as the result of an "intelligent choice", appreciated the danger of any such hidden defect and put himself in position to be killed by it. He did not know that the precautions which would have prevented the defect had not been taken, hence his going on with his work was not consent for respondent to disregard its obligation to take those precautions. We sustain petitioner's first point. Shearman and Redfield, Law of Negligence (Rev. Ed.), Vol. 1, Sec. 135, pp. 328, 332. And see Sun Oil Co. v. Kneten, 5 Cir., 164 F. 2d 806; Hinds et al. v. Wheadon et al., 19 Cal. 2d 458, 121 Pac. 2d 724.

■ There are numerous points presented in the Court of Civil Appeals which were rendered immaterial under its conclusion and as to some of which this court has no jurisdiction, for example, excessiveness of the verdict. So we are obliged to remand the cause to that court to pass on all those points. Ritchie v. American Surety Co. of New York, 145 Texas, 422, 198 S. W. 2d 85.

Accordingly, the judgment of the Court of Civil Appeals is reversed and the cause is remanded to that court for further consideration consistent with this opinion.

Opinion delivered March 7, 1951.

MR. JUSTICE WILSON dissenting.

I respectfully dissent from the law announced in the decision of the majority.

As I view the majority opinion it holds that:

1. The doctrine of assumption of risk does not apply here because that doctrine is limited to a master-servant relationship. Here the plaintiff's husband was an employee of an independent contractor.

2. The doctrine of volenti non fit injuria does not operate to relieve defendant here as a matter of law because a necessary element of the doctrine is not established as a matter of law. The majority lists these elements as:

(a) Knowledge of the specific danger.

(b) Voluntarily putting himself in the way of the specific danger.

The majority opinion points out that for the volenti doctrine to be applicable plaintiff's husband must have known and appreciated the danger, and that by appreciate is meant a full knowledge of the nature and extent of the danger. By the word "voluntary" is meant that he puts himself in the way of the danger of his own free will and as a result of an "intelligent choice", which latter phrase, when tied to the definition of knowledge of danger, means that he must know the very specific danger to which he is exposing himself.

The majority then state that the defect in the pipe in this case was a latent defect and, this being true, plaintiff's husband did not know of the specific defect. Therefore, the majority holds that plaintiff did not as a matter of law voluntarily of his own free will and as a result of an "intelligent choice" place himself in front of that portion of the pipe containing the defect with a full knowledge of the nature and extent of the danger. The Court of Civil Appeals held to the contrary as I understand their opinion.

The case of Grover v. Central Vermont Ry. Co., 96 Vt. 208, 118 Atl. 874, by the Supreme Court of Vermont, upon which the majority rely for their definition of the element of knowledge as the making of an "intelligent choice", holds that the two elements of the doctrine are fact issues which should be submitted to the jury.

"* * It is not enough that the plaintiff knew and appreciated the danger. Was it a voluntary act within the meaning of the maxim? To be voluntary, an act must be done of one's own free will. The word emphasizes the idea of freedom from constraint. Webster's New Int. Dict. The true meaning of the volens of the maxim is referred to as 'intelligent choice' in Thomas v. Quartermaine, 18 Q.B. Div. 685; and the same idea is aptly expressed in Chicago, etc. R. Co. v. Lewis, 103 Ark. 99, 145 S. W. 898, where it is said that the doctrine is based on voluntary exposure to a known danger, and can be applied only when a person may 'reasonably elect' whether or not he shall expose himself to it. We said in Carbine's Adm'r v. Bennington & Rutland R. Co., 61 Vt. 348, 17 Atl. 491, which was a master and servant case, that the doctrine applied if the servant 'knowingly and deliberately assumes a risk that leads him into immediate danger.' In effect the English cases hold that mere knowledge of the risk does not necessarily involve consent to the risk, and

that the maxim does not apply on the mere showing of knowledge of the danger, but only where the circumstances are such as warrant the inference that the plaintiff encountered the risk freely and voluntarily with full knowledge of the nature and extent thereof. Thomas v. Quartermaine, supra; Yarmouth v. France, 19 Q.B. Div. 647; Smith v. Baker, 60 L.J. (N.S.) 683; Broom's Legal Maxims (7th Ed.) 219. Lord Chancellor Halsbury expresses the opinion in Smith v. Baker that, in order to defeat a plaintiff's right by the application of the maxim, when he would otherwise be entitled to recover, the jury ought to be able to affirm that he consented to the particular thing being done which would involve the risk, and consented to take the risk upon himself."

In the case of Fitzgerald v. Connecticut River Paper Co., 155 Mass. 155, 29 N.E. 464, the Supreme Court of Massachusetts held that the question of whether the plaintiff knew and appreciated the danger was one of fact for the jury.

"We are of opinion that it cannot be said as a matter of law that the plaintiff in the present case, in attempting to go down the steps, voluntarily assumed a risk which she understood and appreciated, and which resulted in the accident. She knew that the steps were icy, and that there was some danger in passing over them. But the evidence tended to show that their condition in regard to slipperiness was constantly changing in different states of the weather, with the spray falling daily from steampipes and freezing upon them. Common experience tells us that the degree of slipperiness of ice is not always determinable from an ocular inspection of it. If it were certain that the extent of the danger was obvious to one who saw the surface of the steps, the case would be different. Besides, there was evidence tending to show that she had no way of leaving the defendant's mill except by going down the steps, and that was important to be considered in deciding whether she took the risk voluntarily. Osborne v. Railroad Co., 21 Q.B. Div. 220, a case in which the plaintiff sued to recover for an injury received in going down some icy stone steps, is precisely in point. It is said in the opinion referring to the language of the justices in Yarmouth v. France, and Thomas v. Quartermaine, supra, that 'those observations go far to make it hard for a defendant to succeed on such a defense as that relied on here; for it is probable that juries would find for plaintiffs on the ground that they had not full knowledge of the nature and extent of the risk. But that cannot be helped. * * * These judgments introduce an important qualification of the maxim, volenti non fit injuria. In the present case the plaintiff may well have misapprehended the

difficulty and danger which he would encounter in descending the steps; for instance, he might easily be deceived as to the condition of the snow.' We are of opinion that the case should have been submitted to the jury. Exceptions sustained."

Plaintiff's husband was employed to search for, find and then supervise the correction of latent defects. The testing process was a somewhat elaborate procedure set up for the very purpose of finding latent defects. Basically, it consisted of putting water inside the finished pipe under pressure of a thousand pounds per square inch. The pipe was then hit with a hammer along the area of the seam and the seam was inspected with a magnifying glass in a search for "sweats" etc. The very reason for plaintiff's husband being there was to find defects that were so latent that they could only be brought out by the pipe being subjected to water under a thousand pound per square inch pressure and then could be seen only under a magnifying glass. In Lucas v. Southern Ry. Co., 1 Ga. App. 810, 57 S.E. 1041, the Court of Appeals of Georgia held that in "inspector" cases there was no distinction between latent and patent defects.

"* * In the ordinary practice of railway companies this duty of inspecting cars, both local and foreign, is necessarily performed through inspectors. Where one contracts to undertake this duty of inspection, he necessarily knows that there would be no need of his services if dangers were not probable; that he himself is employed for the very purpose of ferreting out these dangers, both latent and patent; and that, if he properly discharges his duty, he will be the first person to know of these dangers. He therefore usually has equal means with the master of knowing of every danger incident to his duties. Consequently if, in making the inspection, he is injured by a latent danger, he has but encountered the risk which he assumed as part of his employment and the master is not liable."

The majority distinguishes this case from the common law "inspector" cases on the grounds that plaintiff's husband inspected only and did not inspect and fix. The undersigned sees no real distinction. But here plaintiff's husband had the duty of "supervising" the repair of the defect and defendant must repair the defect under his direction and to his satisfaction, else that particular piece of pipe would be rejected.

Did plaintiff know and appreciate the danger? He knew that there might be defects in the weld. Otherwise there would have been no occasion for his job. He knew also that there was water inside the pipe under pressure of a thousand pounds per square

inch. He knew that the only thing standing between him and water under such an enormous pressure was the weld itself. It becomes a fact issue as to whether or not he knew and appreciated the danger which might follow from applying water under such pressure to a defective weld. In the case at bar, defendant requested a number of special issues raising the question of plaintiff's husband's knowledge of the danger which the trial court refused. Defendant complained of this refusal in its motion for a new trial, but did not carry it forward into assignments of error in the Court of Civil Appeals, apparently electing to stand only on its contention that the volenti doctrine was raised as a matter of law.

The doctrine of assumption of risk raised in cases of employees versus employers penalizes the employee for having the courage to face danger and for his loyalty to his employer in carrying on his job in the face of danger. For that reason it is considered a harsh doctrine and has been generally abolished in areas of the law where the doctrine has come before a legislative body. The doctrine of volenti non fit injuria is closely parallel to it in that it may penalize courage in the face of danger, but loyalty to the particular defendant is not one of the motives which inspires the plaintiff to face danger. In these "inspector" cases, where the duties of the inspector may conflict with the interest of the defendant, such a loyalty is not present.

A second distinction between this type of case and that between an employee versus employer is that the defendant has no command authority over the plaintiff.

Opinion delivered March 7, 1951.

### ON MOTION FOR REHEARING.

JUSTICE BREWSTER delivered the opinion of the Court.

In an earnest motion for rehearing respondent complains because, after stating in our original opinion that we would "examine the question of respondent's liability on basis of whether it owed Wood any duty not to injure him, as presented by the first point" of error, instead of discussing the question of no duty, "as such", we proceeded "to discuss the case entirely from the point of view of voluntary undertaking of risk, assumed risk, or volenti non fit injuria, whichever branch of this particular principle may be considered involved in this case",

without ever returning to the question of no duty except to "sustain petitioner's first point."

■ We took that course because, as we pointed out, ours is one of the several American jurisdictions which hold that the doctrine of assumed risk urged in petitioner's second point applies only in cases of master-servant relationship. Then we proceeded to determine whether, under the closely kin and not substantially different maxim of volenti non fit injuria, Wood assented to respondent's several omissions in welding the pipe which the jury found proximately caused his death. Levlon et ux. v. Dallas Ry. & Terminal Co. (Civ. App.), 117 S. W. 2d 876, error refused. We went on the theory that if he did not so consent the omissions would amount to a legal wrong, that is, a violation of duty on the part of respondent. As stated in our original opinion, the volenti maxim means that *the injured party consented to the act or omission which caused his injury and which, without such consent, would be a legal wrong*. White v. McVicker, 216 Iowa, 90, 246 N. W., 385. Equally applicable to it is the declaration in Magnolia Petroleum Co. v. Ray (Civ. App.), 187 S. W. 1085, 1089, in respect to assumed risk: "The defense of assumption of risk implies negligence on the part of the master creating liability for the damages sustained, unless such a right of action is destroyed by that defense." The headnote in 65 C.J.S., Negligence, sec. 174, p. 848, states: "Under a doctrine referred to as the doctrine of assumed or incurred risk, and on basis of the maxim, Volenti non fit injuria, it is the rule that one who voluntarily exposes himself or his property to a known and appreciated danger due to the negligence of another may not recover for injuries sustained thereby."

■ Under the circumstances of this case we are convinced that respondent owed Wood the duty not to injure him and that Wood did not consent to the omissions which caused his injury. The effect of this holding is to sustain both points of error.

Respondent's motion for rehearing is overruled.

Opinion delivered April 18, 1951.

Second motion for rehearing overruled May 23, 1951.