Benny FARLEY, by and through his next friend, Charles L. Ballman, Appellant,

v.

M M CATTLE COMPANY, Appellee.

No. 5665.

Court of Civil Appeals of Texas, Waco.

March 31, 1977.

Rehearing Denied April 28, 1977.

Edwards & Associates, Lubbock, Jim M. Perdue, William Mac Gann, Miller, Gann & Perdue, Houston, for appellant.

Robert L. Templeton, Oscar P. Fields, Jr., Amarillo, Rex W. Easterwood, Hereford, for appellee.

## OPINION

JAMES, Justice.

This is a suit for personal injuries growing out of a ranching accident, and is the second appeal herein. After a former trial, the appeal of this cause terminated in an opinion by our supreme court in *Farley v. M M Cattle Co.* (Tex.1975) 529 S.W.2d 751, whereby the cause was reversed and remanded for new trial on the merits. Thereafter, the case was tried again by jury after which judgment was entered that the Plaintiff take nothing, from which Plaintiff prosecutes this appeal. We reverse and remand.

Plaintiff Benny Farley, acting by and through his guardian, Charles L. Ballman as Next Friend, brought this suit for damages against the Defendant M M Cattle Co. for personal injuries sustained when the horse he was riding collided with another horse ridden by a co-worker while they were in the process of rounding up cattle belonging to the Defendant, M M Cattle Company.

On July 12, 1971, Plaintiff Benny Farley (then a fifteen year old boy), Danny Beebe, James Guinn, and Cyril Houston (Bunk) Farley were rounding up calves from a pasture of the Bear Creek Ranch owned and operated by the Defendant M M Cattle Company. Bunk Farley was the foreman of the ranch and is the father of Plaintiff Benny Farley. On the occasion in question, Danny Beebe (then a sixteen year old boy) and Benny Farley, each on horseback, were engaged in moving about fifty calves when one of the calves broke away from the herd. Plaintiff was riding a horse named "Crow-bar." Both Danny Beebe and Benny Farley rode after the calf to bring it back, and in doing so the two cowboys ran their horses on either side of the running calf for the purpose of guiding it back to the herd. During this rapidly moving process, the horses of the two boys became headed in a direction which if continued would result in a collision. Upon discovering the impending peril, Danny Beebe reined his horse to his left away from Benny Farley's horse. At almost the same instant Danny Beebe attempted to avoid the accident, Benny Farley's horse struck the side of Danny Beebe's horse, causing Danny's horse to stumble to its knees. Benny Farley's horse fell to the ground; whereupon Benny was thrown off his horse, thereby causing the severe personal injuries in question.

Trial was had to a jury which made (or refused to make) findings as follows:

(1) Refused to find that prior to the occurrence in question it was agreed between Joe D. Whittenburg (President of Defendant M M Cattle Company) and Bunk Farley that Bunk Farley could hire Benny Farley to work in the employment of M M Cattle Co.

(2A) Bunk Farley was acting within the course and scope of his employment on behalf of M M Cattle Co. in furnishing the horse "Crowbar" to Benny Farley on July 12, 1971.

(2B) Bunk Farley was acting within the course and scope of his employment on behalf of M M Cattle Co. in supervising Benny Farley on July 12, 1971.

(3) At the time of the occurrence in question, M M Cattle Co. acting by and through Bunk Farley:

(A) Furnished Benny Farley with a horse that was not safe for use in the work that was to be done by Benny Farley.

(B) Failed to supervise Benny Farley in the work that was to be done by Benny Farley.

(4A) Failed to find that M M Cattle Co., acting by and through its foreman Bunk Farley, was negligent in furnishing Benny with a horse that was not safe for use in

the work that was to be done by Benny Farley.

(4B) M M Cattle Co. acting by and through its foreman Bunk Farley was negligent in failing to supervise Benny Farley in the work that was to be done by Benny Farley.

(5) Failed to find that the negligence shown in 4B above was a proximate cause.

(There is no Special Issue No. 6).

(7A) On the occasion in question, the horse "Crowbar" had dangerous propensities abnormal to his class. The court defined "dangerous propensities" to mean that although the animal is not vicious, he has a dangerous tendency which is unusual and is not necessary for the purposes for which he was being used. The term "abnormal to his class" was defined to mean traits or characteristics which are dangerous and not usual to this particular type of animal.

(7B) On the occasion in question M M Cattle Co. acting by and through its foreman Bunk Farley knew or in the exercise of ordinary care should have known of such dangerous propensities; and

(7C) Such dangerous propensities were a producing cause of Benny Farley's injuries.

(8) Benny Farley failed to keep a proper lookout for his own safety while chasing the calf in question, which was negligence and a proximate cause.

(There is no Special Issue No. 9).

(10) Benny Farley failed to slow or stop his horse at a time when he knew that the two horses were after one calf, but that such failure was not negligence.

(11) Benny Farley was "laning" the calf he was chasing on the occasion in question, which was negligence and a proximate cause.

(12A) Benny Farley knew and appreciated the risk and danger that there may have been in riding the horse "Crowbar" on the occasion in question; and

(12B) He (Benny Farley) voluntarily exposed himself to whatever risk and danger there may have been in riding the horse "Crowbar" on the occasion in question.

(13) Refused to find that Bunk Farley and his attorneys acted in collusion with Benny Farley's Guardian and his attorneys in the preparation or trial of this suit.

(14) Found damages as follows:

(A) $55,000.00 for hospital and medical care for Plaintiff from December 22, 1973 (the date of Plaintiff's eighteenth birthday) to the date of trial.

(B) $250,000.00 for future hospital and medical care.

(C) "Zero" for Plaintiff's lost earnings from December 22, 1973 to the date of trial.

(D) "Zero" for Plaintiff's future loss of earning capacity.

(E) "Zero" for past physical pain and mental anguish.

(F) "Zero" for future physical pain and mental anguish.

After jury verdict, the trial court entered judgment that Plaintiff take nothing, from which he appeals. We reverse the trial court's judgment and remand the cause for retrial on the merits.

■■■ Appellant comes to this court on twenty-five points of error. Points nine through fourteen bring into focus the central problem with which we are confronted, to wit: by the jury's answers to Special Issue No. 7 it found (a) The horse "Crowbar" had dangerous propensities abnormal to his class; (b) the Defendant Cattle Co. knew or in the exercise of ordinary care should have known of such dangerous propensities, which (c) were a producing cause of Plaintiff Benny Farley's injuries. By such findings the jury established the elements of a cause of action in favor of Plaintiff Benny Farley against the Defendant Cattle Co. based upon strict liability. See *Marshall v. Ranne* (Tex.1974) 511 S.W.2d 255 and the authorities therein cited. Contributory negligence is not a defense in a strict liability action; however voluntary assumption of risk, if established, is a valid defense. *Marshall v. Ranne,* supra; *Henderson v. Ford Motor Co.* (Tex.

1974) 519 S.W.2d 87. Also see *Rosas v. Buddies Food Store* (Tex.1975) 518 S.W.2d 534; *Rourke v. Garza* (Tex.1975) 530 S.W.2d 794.

By their answers to Special Issue No. 12 the jury found: (a) that Benny Farley knew and appreciated the risk and danger that there may have been in riding the horse "Crowbar" on the occasion in question, and (b) that he (Benny Farley) voluntarily exposed himself to whatever risk and danger there may have been in riding the horse "Crowbar" on the occasion in question. These jury findings if allowed to stand establish the defense of voluntary assumption of the risk against Plaintiff, which is a proper defense to strict liability, according to the above-cited decisions of our Supreme Court. Also see *J. & W. Corporation v. Ball* (Tex.1967) 414 S.W.2d 143, 146.

Plaintiff-Appellant asserts that there is no evidence to support the jury's answers to Special Issue 12(a) and (b), concerning voluntary assumption of the risk on Plaintiff's part, and that such findings are so against the great weight and preponderance of the evidence as to be manifestly unjust. Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Texas Law Review 361; *In re King's Estate* (1951) 150 Tex. 662, 244 S.W.2d 660. We sustain these contentions.

Plaintiff Benny Farley was about fifteen and a half years of age at the time of this accident, and the horse Crowbar was almost four years old at said time. Bunk Farley lived with his family on Bear Creek Ranch, the ranch owned and operated by the Defendant M M Cattle Company, and was foreman of said ranch. At that time Bunk Farley's family consisted of his wife, a daughter and his son, Benny Farley. Bunk Farley basically had charge of the ranch operation, and did the hiring and firing of employees, subject only to the control of Joe D. Whittenburg, President of M M Cattle Co.

The horse Crowbar was foaled in August 1967, from a mare belonging to Joe D. Whittenburg, and had been under the care of Bunk Farley all of its life. Bunk started breaking the colt when he was about two years old. The colt ran loose in the pasture until Bunk haltered him. No one had handled the colt from the time he was born until Mr. Farley brought him in and started haltering him, except when Crowbar was castrated at the age of two years. Mr. Farley rode the horse about a year and a half before the accident in question. The horse was originally named "Cimarron"; however, Mr. Farley nicknamed him "Crowbar" because of his cantankerous qualities. Crowbar was a nervous, flighty, irritable, troublesome and contrary type of horse. Mr. Farley said he didn't have too much sense, and that he was always having trouble with him, that he was "boogerish, snaky, broncish, and ill-tempered"; that he would "jump out from under you when a covey of birds would fly up", or would "booger" at such things as a rabbit, or bicycle, or vehicle. Moreover, Crowbar was "a horse that would buck with you," and had thrown Mr. Farley before the accident in question. The horse did not like people, was uncooperative, and would not respond well to being reined. Mr. Farley was the only person that ever rode Crowbar until July 12, 1971, the date of this accident. In other words, Benny Farley had never ridden Crowbar until the date of the accident in question.

Crowbar had been running out with other horses for some thirty to sixty days before Monday, July 12, 1971, Mr. Farley having rounded him up and put him in the lot on the Saturday or Sunday immediately preceding the date of the accident. There had been previous occasions wherein Crowbar had been turned out in the pasture for a month or two; and when he had been thereafter bridled and saddled and ridden, there was a very noticeable difference. On such occasions the horse would be "liable to pitch with you, liable to do anything with you until he gets warmed up; even the second day after you gather him, he's liable to pitch with you until you get some more hours on him, some more sweat out of him." With reference to his responding to command after being out in the pasture for a

while, testimony showed he would be "rusty" and would not handle like he would after he had been ridden for a month or so.

According to Mr. Farley, they started rounding up cattle at about 7:00 A.M. on Monday, July 12, 1971. The accident happened at about 9:30 A.M. said date. Mr. Farley was the one who instructed Benny to ride Crowbar. This was the first time Benny had been on Crowbar, and was the first time Crowbar had been ridden since he had been running loose. Benny started riding horses when he was about four years old, and had done a lot of work on the ranch.

When Mr. Farley put Benny on Crowbar, the horse pitched; whereupon Mr. Farley told Benny to "pick him up or he will buck you off." Mr. Farley testified that he did not consider this particularly unsafe or dangerous, considering the general nature of ranch work. Other than this occurrence, during the period of time between 7 A.M. and 9:30 A.M., the approximate time of the accident, Benny had no trouble with Crowbar to the knowledge of any witness.

Let us first consider whether there is any evidence of probative value to support the jury finding that Benny knew and appreciated the risk and danger that there may have been in riding Crowbar on the occasion in question, both at the time he got on the horse the morning of the accident, and at the time he and Danny Beebe "laned" the calf and Benny was injured about two and a half hours later. Then let us consider whether there is any evidence of probative value to support the jury's finding that Benny voluntarily exposed himself to whatever risk and danger there may have been in riding Crowbar, both at the time he got on the horse that morning and at the time he was injured.

■ The theory of assumption of the risk, or volenti non fit injuria, contemplates that a party may not recover for injuries received from a voluntary exposure to a known and fully appreciated danger. In *Halepeska v. Callihan Interests, Inc.* (Tex. 1963) 371 S.W.2d 368 our Supreme Court said on page 379:

"The *volenti* doctrine is an affirmative defense. 'Volenti' is a contraction of the Latin phrase, *volenti non fit injuria,* which means legally that a plaintiff may not recover for an injury to which he assents; that a person may not recover for an injury received when he voluntarily exposes himself to a known and appreciated danger. In this state, the decision to incur the risk must have been deliberate; i. e., made with knowledge and appreciation of the danger so that it may be said that the person acted as a result of an intelligent choice. *Wood v. Kane Boiler Works,* 150 Tex. 191, 238 S.W.2d 172 (1951). Logically, a plaintiff cannot make an intelligent choice to confront a risk if he does not actually know of the danger, or know such facts as would in law charge him with knowledge of the danger and appreciation thereof."

At another place on page 379, the Supreme Court goes on to say that the test in *volenti* is *subjective,* that is, did the plaintiff actually know and appreciate the risk or danger, and thereafter uses this language:

"The standard to be applied is a subjective one, of what the particular plaintiff in fact sees, knows, understands and appreciates. In this it differs from the objective standard which is applied to contributory negligence."

This subjective standard is described as a person's "actual, conscious knowledge," and what a person "should have known" or "should have appreciated" has been said by our Supreme Court to be immaterial to findings concerning assumption of the risk. *Massman-Johnson v. Gundolf* (Tex.1972) 484 S.W.2d 555.

■ Moreover, the encounter or voluntary exposure to a known dangerous condition must result from an intelligent choice. *Harvey v. Seale* (Tex.1962) 362 S.W.2d 310; *Rabb v. Coleman* (Tex.1971) 469 S.W.2d 384; *Wood v. Kane Boiler Works,* supra. It has been held that the voluntariness of the continued use of a known defective product is dependent upon and gauged by the age, intelligence, experience and judgment of

the user. *Ellis v. Moore* (Tex.1966) 401 S.W.2d 789. That is to say, if by reason of age, or lack of information, experience, intelligence or judgment, the plaintiff did not understand the risk involved, he will not be taken to have assumed the risk. *Heil Co. v. Grant* (Tyler, Tex.Civ.App.1976) 534 S.W.2d 916, NRE. Also see *Dee v. Parish* (Tex. 1959) 160 Tex. 171, 327 S.W.2d 449.

▮ In the case at bar, it is significant that the accident in question caused severe brain damage to Benny Farley, to the extent that he has not been able to speak and express himself, in addition to practically all of his body being paralyzed. The consensus of medical testimony is to the effect that this situation will not improve in the future as long as he lives. This being so, we have no testimony of any kind available from Benny Farley concerning any phase of this case; therefore, we have no evidence whatever from him with respect to what he *subjectively knew* about Crowbar and about Crowbar's dangerous propensities. The jury findings establish that Crowbar had dangerous propensities and that the Defendant M M Cattle Company through its foreman Bunk Farley knew or should have known of these dangerous propensities which were a producing cause of Benny's injuries. Of course Bunk Farley knew and appreciated these dangerous propensities due to his association with Crowbar all of Crowbar's life; however, there is no direct evidence in the record to show that Benny knew and appreciated these propensities and the dangers they presented. Moreover, Benny had no free and intelligent choice insofar as riding Crowbar on the date in question. He was instructed by his father, Bunk Farley, who was foreman of the Defendant Cattle Company, to ride Crowbar that day. Would it be fair to say that Benny, a fifteen year old boy had a "free and intelligent choice" to not ride Crowbar, by saying he could simply disobey his father and demand another horse, or stay at home and not work that day? We do not think so. See *Marshall v. Ranne* (Tex.1974) 511 S.W.2d 255.

▮ We have no way of knowing what Benny Farley subjectively knew, and whether he appreciated the risk and danger involved in riding Crowbar that day. To say that he had such knowledge and appreciation of the risk and danger because his father had such knowledge and appreciation would be no more than surmise and speculation. Moreover, we believe as a matter of law that Benny did not voluntarily expose himself to such risk and danger because he had no free and intelligent choice of alternatives. Likewise we believe that there is no evidence of Benny's subjective knowledge and appreciation, or that he voluntarily exposed himself to danger when he and Danny Beebe "laned" the calf when the accident occurred. It is a matter of common knowledge that fifteen year old boys are likely to be thoughtless, impulsive, and incapable of knowing and appreciating risks and dangers. Here again we have no evidence of what he subjectively knew and appreciated.

We therefore are of the opinion and hold that there is no evidence of probative value to support the jury's findings in answer to Special Issue 12(a) and 12(b). However, in the event that we are in error in so holding, we further hold that if there is any evidence of probative value to support said findings of voluntary assumption of risk, that said jury findings are so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. *In re King's Estate* (1951) 150 Tex. 662, 244 S.W.2d 660.

▮ Appellant's point number eighteen asserts that the jury's answers of "zero" to Special Issue No. 14(c), (d), (e) and (f), same being Plaintiff's damages for past lost earnings, future loss of earning capacity, and past and future pain and suffering, are so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. We sustain this contention. The evidence is undisputed that Benny Farley has not been able to work since the accident, and in reasonable medical probability will never be able to work in the future. The jury found his hospital and

medical expenses from December 22, 1973 until the time of trial (about thirteen months) to be $55,000.00, and found that his future hospital and medical expenses amounted to $250,000.00. Plaintiff's expert testimony showed his lost wages from age eighteen to the time of trial amounted to $13,925.00 and the discounted value of his future earnings during his work life expectancy was $497,708.00. The evidence further showed that since the date of the accident Benny has experienced pain and suffering and will continue to experience the same in the future. The jury's findings of zero for these elements of damages are factually insufficient. Rule 328, Texas Rules of Civil Procedure; *Lowery v. Berry* (1954) 153 Tex. 411, 269 S.W.2d 795; *Carrico v. Busby* (Houston 1st, Tex.Civ.App.1959) 325 S.W.2d 413, NRE.

Appellant's point number twenty complains of the trial court's exclusion of evidence concerning Plaintiff-Appellant's medical expenses from the date of the accident, July 12, 1971, to the date of Appellant's eighteenth birthday, December 22, 1973. We sustain this contention.

By way of Bill of Exception, Plaintiff-Appellant showed Benny Farley incurred hospital and medical expenses of $67,452.77 from the date of the injury (7–12–71) until his eighteenth birthday (12–22–73). This testimony was excluded upon motion by Defendant, and of course no special issue inquired of this aspect of damages. The exclusion of this evidence was error. This suit was brought in behalf of Benny Farley by one Charles L. B. llman as the duly authorized Guardian of the Person and Estate of Benny Farley. We are of the opinion and hold that said Guardian acting in said capacity had the right and duty to sue for said damages in behalf of Benny Farley. See Secs. 229 and 230(b) Texas Probate Code; *Littleton v. Jordan* (Texarkana, Tex. Civ.App.1968) 428 S.W.2d 472, writ refused.

For the reasons hereinabove stated, judgment of the trial court is reversed, and the cause is remanded for retrial on the merits.

REVERSED AND REMANDED.